[No. 14707.   Department One. — June 16, 1892.]

## IN THE MATTER OF THE ESTATE OF CHARLES McDEVITT, DECEASED.

CONTEST OF WILL — UNDUE INFLUENCE — PLEADING — ACTS PRIOR TO WILL — IMPORTUNITIES OF RESIDUARY LEGATEE. — A contest of a will on the ground of undue influence, which alleges acts of undue influence, and importunity continued for a long time prior to the making of the will, sufficiently connects the alleged undue influence with the testamentary act, by alleging that at the date of the will, and while in an enfeebled condition of mind and body, and unable to resist the importunities of one of the residuary legatees, deceased made his mark to said pretended will.

ID. — VERDICT OF UNDUE INFLUENCE — NEW TRIAL. — EVIDENCE INSUFFICIENT IN LAW. — Where the evidence is insufficient, as matter of law, to justify a verdict, or decision that a will was executed under undue influence, it is ground for a new trial. The evidence in this case reviewed, and held insufficient in law to sustain such a verdict.

ID. — EVIDENCE — DECLARATIONS OF TESTATOR — TESTAMENTARY INTENTIONS — RES GESTÆ — WEIGHT OF EVIDENCE. — Expressions of the deceased as to his testamentary intentions, though admissible to prove a friendly feeling toward the persons in regard to whom they are used, yet do not tend to prove that a will conforming to such expressions was procured through undue influence, unless made so near the time of the execution of the will as to constitute a part of the res gestæ; and where the testator is beyond question of sound mind, they are entitled to no weight at all, in the absence of proof of influence as to the very testamentary act.

ID. — FAIRNESS OF TESTAMENTARY DISPOSITION — DIVISION OF PROPERTY AMONG NEPHEWS AND NIECES. — Not to divide the property of a testator equally among nephews and nieces does not make his will undutiful or inequitable. An uncle is under no obligation, ordinarily, to provide for his nephews, either when living or by his will.

ID. — JUDICIOUS DISPOSITION. — A testator of sound mind has a right to make an unjust, unreasonable, or even a cruel will, and if no apparent re-
XCV. CAL.—2

straint or undue influence is proved to have induced its execution, the will must be sustained, whether the disposition made of his property is judicious or not.

Id. — General Influence — Evidence — Presumption. — General influence, not brought to bear directly upon the testamentary act, however strong or controlling, is not undue influence, such as will afford ground for the setting aside of a will of a person of sound mind. There must be evidence, either direct or circumstantial, that pressure was brought to bear directly upon the testamentary act, and there is no presumption against the will, except in cases where the beneficiaries, or parties instrumental in having the will executed, sustain a confidential relation to the testator, or where the testator is weak, physically and mentally, and those having exclusive access to him have procured an unnatural will.

Id. — Circumstantial Evidence — Suspicion — Degree of Proof Required. — While circumstantial evidence may be sufficient to prove undue influence upon the testamentary act, it must do more than raise a suspicion, and has the force of proof only when the circumstances proved are inconsistent with the claim that the will was the spontaneous act of the testator. It does not amount to proof if the circumstances are equally consistent with the theory of undue influence, and with the hypothesis that the will was the free act of an intelligent mind, especially if other circumstances are wholly inconsistent with the hypothesis of undue influence.

Id. — Presumption of Law. — The presumption of law, in the absence of all proof, upon the contest of a will, is in favor of the will.

Id. — Dismissal — Failure to Enter Judgment — Discretion — Review upon Appeal. — Where it appears that the contestant of a will had paid the clerk the requisite fee for the entry of any judgment that might be recovered in his favor, and that upon the date of the verdict a judgment was signed in accordance with the verdict, which the clerk was requested to enter, and which the contestant believed was entered, until after service of a notice of motion to dismiss the cause for failure to have the judgment entered within six months after the verdict, the discretion of the court below in refusing to dismiss the cause upon that ground will not be disturbed upon appeal.

Appeal from a judgment of the Superior Court of the city and county of San Francisco, from orders refusing a new trial, and refusing to dismiss the cause for failure to have judgment entered within six months from the date of the verdict.

The facts in regard to the contest of the will are stated in the opinion. On the motion to dismiss the judgment, the affidavit of the contestant showed that he had paid the clerk's fee for entering the judgment, and that the judgment was signed at the date of the verdict, August 11, 1889, and that the clerk was requested to

enter it, and that he supposed in good faith that it had been entered. It was not in fact entered until May 2, 1891. The motion to dismiss the cause for failure to enter the judgment within six months after the verdict was dated April 29, 1891, and was noticed for hearing May 1, 1891. The court refused the motion.

*Jones & O'Donnell, E. W. McKinstry,* and *E. F. Preston,* for Appellant.

Declarations made prior to the execution of the will are not admissible to prove the fact of undue influence, and are not admissible to prove even the state of the mind of the testator, unless it is offered in connection with other evidence tending to prove mental incapacity, where such issue is necessarily involved. (1 Redfield on Wills, 554, 557; *Jones* v. *Roberts,* 37 Mo. App. 181; *Cawthorn* v. *Haynes,* 24 Mo. 236; *Tingley* v. *Cowgill,* 48 Mo. 291; *Spoonmore* v. *Cuble,* 66 Mo. 579; *Rule* v. *Maupin,* 84 Mo. 587; *Bush* v. *Bush,* 87 Mo. 480; *Middleditch* v. *Williams,* 45 N. J. Eq. 736; *Rusling* v. *Rusling,* 36 N. J. Eq. 120; *Herster* v. *Herster,* 122 Pa. St. 239; *Den* v. *Van Cleve,* 4 Wash. C. C. 262; *Boylan* v. *Meeker,* 28 N. J. L. 274; *Pemberton* v. *Pemberton,* 41 N. J. Eq. 349; *In re Pemberton,* 40 N. J. Eq. 520; *Rusling* v. *Rusling,* 36 N. J. Eq. 603; *Van Valkenburg* v. *Van Valkenburg,* 90 Ind. 438.) It was error for the court to refuse to limit the declarations of the testator, admitted, not as proof of the fact of undue influence, but for the purpose of showing the state of mind of the testator, to the purpose for which they were received. (1 Redfield on Wills, 4th ed., 549; *Jones* v. *Roberts,* 37 Mo. App. 181; *Herster* v. *Herster,* 122 Pa. St. 239; *Will of Storer,* 28 Minn. 9; Hayne on New Trial and Appeal, sec. 106; *Voorman* v. *Voight,* 46 Cal. 398; *People* v. *Collins,* 48 Cal. 277; *People* v. *Estrado,* 49 Cal. 171; *People* v. *Ah Yute,* 53 Cal. 614; *Henry* v. *Everts,* 29 Cal. 610; *Williams* v. *Hartford Ins. Co.,* 54 Cal. 449; *Alexander* v. *Denaveaux,* 59 Cal. 476; *Potter* v. *Baldwin,* 133 Mass. 427.) As the testimony mainly relied upon by the contestants con-

sisted of declarations of decedent made at remote periods prior to the execution of the will, and moreover, the declarations had no reference whatever to any testamentary act, the motion for a nonsuit should have been granted. (See *Boylan* v. *Meeker*, 28 N. J. L. 274; *In re Bennett's Will*, 6 N. Y. Sup. Ct. 199; *Mason* v. *Williams*, 6 N. Y. Sup. Ct. 479; *In re McKenna's Will*, 4 N. Y. Sup. Ct. 458; *In re Johnson's Will*, 5 N. Y. Sup. Ct. 792; *In re White's Will*, 5 N. Y. Sup. Ct. 295; *Latham* v. *Schaaf*, 25 Neb. 535; *Herster* v. *Herster*, 122 Pa. St. 239; *Will of Storer*, 28 Minn. 9.) To prove undue influence, it must be shown that such influence was exercised at the very time of making the will. (*Webber* v. *Sullivan*, 58 Iowa, 260; 1 Redfield on Wills, sec. 534; *Eckert* v. *Flowry*, 43 Pa. St. 46.)

*P. F. Dunne*, and *Thomas F. Barry*, for Respondents.

Evidence as to the conduct, acts, and declarations of the testator, tending to show the state of his mind and feelings inconsistent with his testamentary act, was clearly admissible. (*Waterman* v. *Whitney*, 11 N. Y. 157; 62 Am. Dec. 71; *Boylan* v. *Meeker*, 28 N. J. L. 274; *Bates* v. *Bates*, 27 Iowa, 110; 1 Am. Rep. 263; *Canada's Appeal*, 47 Conn. 450; *Colvin* v. *Warford*, 20 Md. 357; *Beaubien* v. *Cicotte*, 12 Mich. 459; *Forney* v. *Farrell*, 4 W. Va. 729; *Thompson* v. *Updegraff*, 3 W. Va. 629; *Reel* v. *Reel*, 1 Hawks, 247; 9 Am. Dec. 632. See also, on same subject, Schouler on Wills, sec. 243.) The declarations of a testator of his intention to make certain testamentary dispositions are admissible as evidence of such purpose, and a long-cherished purpose of the testator, inconsistent with the actual provisions of the will, may also be shown. (1 Redfield on Wills, 529, 537, 552, 560, 566; Schouler on Wills, secs. 242, 243; and see also *Seale* v. *Chambliss*, 35 Ala. 19; *Beaubien* v. *Cicotte*, 12 Mich. 459; *Will of Mary Ames*, 51 Iowa, 396; *Thompson's Will*, 13 Phila. 403; *Forney* v. *Farrell*, 4 W. Va. 729; *Lee* v. *Dill*, 11 Abb. Pr. 214; *In re Welch*, 1 Redf. 238; *Brydges* v. *King*, 1 Hagg. Const. 256.) Whether a will is contested

for incapacity or for fraud, or undue influence, it is always proper to inquire whether the provisions of the will are just and reasonable, and accord with the state of the testator's family relations, or the contrary; for if they are, that circumstance is decidedly favorable to sustaining the will; while, on the other hand, if it makes an inequitable distribution of the property, or one quite different from what was naturally to be expected, this circumstance tends in the opposite direction. Gross and unaccountable inequalities in the disposition of a will require, in general, some satisfactory evidence that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind; and when such evidence is wanting, the will should be set aside. (Schouler on Wills, sec. 238; and to the same effect, *Fountain* v. *Brown*, 38 Ala. 72; *Harold* v. *Harold*, 1 Daveis, 203; *Waters* v. *Cullen*, 2 Bradf. 354.)

TEMPLE, C. — This proceeding is to contest the will of decedent, and the appeal is taken by the beneficiaries under the will from a judgment in favor of the contestants, from an order refusing a new trial, and from an order refusing to dismiss the proceeding on the ground that the judgment was not entered within six months after its rendition.

Charles McDevitt died on the 28th of February, 1890, at the age of sixty-five years. The will in question was executed September 27, 1889.

The testator, at the time this will was executed, was an invalid, suffering from internal cancer, from which he finally died. He seems, however, not to have been so ill as to prevent his going out. One of the contestants, James McDevitt, testified that he and his family saw him nearly every day until three or four months before he died, and further, " I saw Uncle Charlie in our yard about a month or so before he died. He looked sickly then, and was as white as the wall. He died by inches."

Deceased was at the time living with his brother An-

drew, some distance from the residence of the witness. So that he must have been going about for several months after the will was executed.

Deceased was a bachelor.   He was a native of Ireland, and it appears that he had at one time three brothers and a sister living in San Francisco.   The brothers were all married.   Two, Michael and James, died before the testator, each leaving several children, the contestants herein.

James McDevitt, the father of some of the contestants, and the deceased were at one time partners in the draying business in San Francisco.   The business prospered, and they purchased a ranch in Sonoma County, which was managed by the deceased, while James managed the draying business.   About ten years before the testator's death there were business differences between himself and James, which resulted in litigation, and the dissolution of the copartnership.   Prior to that time, when visiting the city, which he did two or three times a year, the testator lived with his brother James.   At the time of the litigation he went to live with his brother Andrew, and continued to reside there until his death, about ten years later.   After the dissolution, James became the owner of the ranch, and Charles of the real estate, which now constitutes his estate.

The deceased left as heirs a sister, residing in Massachusetts, a brother, Andrew, at whose residence he died, seven nephews and nieces, children of his deceased brother James, and five nephews and nieces, children of a deceased brother Michael.   All except the sister resided at San Francisco.

In the will, executed, as we have seen, five months before his death, the deceased gave one thousand dollars to his sister, and all the residue of his estate to his brother Andrew and members of his family.   The will contained the following: "I make no provision for the children of my deceased brother James McDevitt, nor those of my deceased brother Michael McDevitt, and

my omission to provide for them is therefore intentional."

The contest is upon the ground that the will was procured through the undue influence of Andrew McDevitt, in this, that decedent had, prior to the execution of the will, for several years been living at the house of Andrew, and had become subject to the wishes and much in fear of and dominated by him; that at the time decedent had been sick and suffering, and became enfeebled in mind and body, and while in that condition was not permitted by said Andrew to see and converse with any of his relations except the immediate family of said Andrew, and was falsely told by said Andrew that his relations, except said Andrew and his family, cared nothing for him, and he ought not to do anything for them, and was urged and importuned by said Andrew, while in said condition, to make a will giving all his estate to Andrew and his family; that, unable to resist the importunities, decedent made his mark to said will.

The contest was tried with a jury, and by stipulation the only issue was: "Did the said Charles McDevitt, at the time of signing the instrument offered for probate, sign or execute the same under undue influence of Andrew McDevitt?" To which the jury answered yes, and the findings of the court were in accordance with the verdict.

The appellant contends that the statement of the contest is insufficient, because in the specifications of the acts of undue influence the past tense is used; but I think the concluding sentence, "that at said date, and while in said condition, and unable to resist the importunities of said Andrew, deceased made his mark to said pretended will," sufficiently connects the alleged undue influence with the testamentary act.

The appellant makes several points, either of which, he contends, requires a reversal. After a careful examination, I am convinced that the evidence is insufficient, as matter of law, to justify the verdict and decision.

This is one of the grounds of the motion for a new trial. If this position be correct, the other points become matters of little consequence. I shall therefore proceed to consider this question.

It may be premised, in the first place, that sixty-five is not such an advanced age as of itself to suggest senility, and that the evidence shows, without conflict, that the testator was a man of sound mind and memory, and of strong will. There is no evidence which tends to show impairment of intellect, unless bad health necessarily has that effect.

In the next place, there is no proof whatever that he was urged or importuned by Andrew or any one else to make a will, or that it was ever suggested by any one that he ought to give his property to Andrew or any one else. It does not appear that the subject of the testamentary disposition of his property was ever mentioned except to contestants, and Andrew testified that he did not know that a will had been made until after the death of the testator, who had sent him, as he says, to get a lawyer to look after his rents; neither Andrew nor any member of his family was present when the will was executed, although it was at Andrew's house.

The will, when executed, was taken away by the attorney, and there was no proof that any member of Andrew's family knew of it.

The witnesses to the will testify to the evident capacity of the testator, the careful reading of the will, and the emphatic approval by the testator of the clause which expressed his intention to exclude the contestants.

Upon the question whether decedent was not permitted to converse privately with contestants, the testimony on behalf of contestants shows, I think, beyond all controversy, not only that the charge is not sustained, but that the contrary is true. No relative was ever denied access to deceased, but on the contrary, whenever any called to see him, they were politely received and kindly treated. Nor do I think the effort to show that Mrs. Andrew McDevitt always remained present during such

interviews a success. Very few of the contestants ever called at all, and these but seldom. This lack of attention is excused on the ground that they had business differences with their Uncle Andrew, and did not think they were welcome at his house; but this does not tend to prove that they were prevented from seeing their Uncle Charles. And besides, the deceased was out and around, more or less, even during his last illness. Some of the contestants occupied the property which constitutes the estate, and many of them testify that they saw decedent frequently at the wharf, and at his property where some of them lived. It does not appear that he was attended by any one during these times, and it is absurd to say that they could not have seen him and conversed with him privately had they desired. There is no evidence tending to show that there was any period during which they did not so meet the decedent, and it appears affirmatively from their own testimony that some of them did so see him during his last illness, and for three months or more after the will was executed.

James McDevitt, son of James McDevitt, deceased, brother of the testator, testified: "Afterwards [after his father's death] we saw him nearly every day until three or four months before he died." And again: "I saw Uncle Charlie in our yard about a month or so before he died."

There is no evidence tending to prove that Andrew McDevitt, or any one else, ever told decedent that none of his relatives except Andrew and his family cared for him. There is, however, testimony to which that construction may be given, so far as the children of James McDevitt are concerned, which is hereafter set out. Giving this the full effect that can be claimed for it, it still utterly fails to prove the allegation in the statement of the grounds of contest.

To prove the friendly relations existing between the decedent and the contestants, they were allowed to put in evidence several expressions of the deceased as to his testamentary intentions. That these expressions as a

general thing do tend, in some measure, to prove a friendly feeling toward the persons in regard to whom they were used, cannot be denied. They were, therefore, properly received. But unless made so near the time the will was executed as to constitute a part of the *res gestæ*, they did not tend to prove that the will was procured through undue influence merely because it does not conform to these expressions. Although, therefore, such statements, when made under such circumstances as to show friendliness, are admissible for that purpose, the effect should be carefully limited by the court to the one for which they are admissible. Only so far as the friendly relations of the parties may have such effect can they throw any light upon the testamentary intentions of the decedent at the time of the execution of the will. In fact, in a case like this, where the testator was, beyond question, of sound mind, they were entitled to no weight at all, in the absence of proof of influence as to the very testamentary act.

None of these expressions as to testamentary intent were sufficiently near the testamentary act to constitute them part of the *res gestæ*. One instance is shown, however, of such declarations, which must have been after the execution of the will, and within two or three months of the time. I think there are no others brought within a year of that act. Charles McDevitt, son of James McDevitt, testified that he went to see decedent at Andrew McDevitt's house in regard to the rents; that after some conversation, Uncle Charlie said, when he saw Uncle Andrew coming: "'Sh! say nothing; it will all be yours by and by. . . . . Q. Well, did he drop the conversation with you, or did he drop it after Andrew came up? A. He dropped it. The deceased acted as though he were afraid of Andrew; never seemed to talk freely except when he was away." On cross-examination he said the remark was: "Go ahead, you folks will have it when I am gone." The witness also stated that this happened two or three months before his uncle died. This witness also testified that he called three times during his uncle's

illness.   The second time Mrs. McDevitt ushered him into the room where his uncle was, and left him alone with him.   He was treated kindly and politely by Andrew McDevitt's family.

Whether by this statement the decedent intended to deceive the witness, or at the time intended to execute a new will, is alike immaterial.   In neither case would it tend to prove that the will which had been executed was procured by undue influence.   For that purpose the evidence would have been incompetent, except in connection with evidence tending to show fraud in procuring the will, or mental unsoundness.   In the last case it might tend to prove that the alleged testator did not know the nature of the will he had executed.   There is no chance for such supposition here.   Although there is a charge of mental weakness in the contest, there was no proof tending to establish it unless proof of physical infirmity constitutes such proof.   That it did not go to this extent here we have seen.   On the other hand, it is shown that he was a man of sound mind and strong will. The attending physician, and the attorney who drew the will, and another subscribing witness, show beyond doubt his sound mental condition at the time, and thorough understanding of the will.   Under such circumstances, this evidence, and all other of like character, is entitled to no weight.   (*Waterman* v. *Whitney*, 11 N. Y. 157; 62 Am. Dec. 71.)

Another witness, whose testimony has already been alluded to as showing an effort to prejudice the alleged testator against some of his nephews and nieces, and who also stated facts tending to show that decedent greatly feared his brother Andrew, is Charles McDevitt, son of Michael McDevitt.   He was a boy about thirteen years of age when his mother died.   His Uncle Charles, on various occasions, took great interest in him as a bright lad, and one who was not strong, and therefore unable to do hard work.   Several times it is shown his Uncle Charles had expressed his intention to assist in educating him, and had declared that he would provide

for him. So far as I can find, these declarations were made at least two years before the will was executed, though some do not seem to be located as to time. After his mother's death, his Uncle Charley took him to live with himself at his Uncle Andrew's, who, however, boarded both his Uncle Charley and him without pay. He went there about February 7, 1886, and remained from four to six months. During this time the conversations testified to occurred. All must have been, therefore, more than three years before the execution of the will.

He says his Uncle Charley looked after his schooling, bought books and clothes, and furnished him spending money, etc. Further: "I heard Andrew, after he would find out that Charley had been down to see James's folks on Sansome Street, abuse him about it. This would only happen after the tenants in the house, who used to play cards with them evenings, had retired. . . . . He would say, 'I heard you have been down to your brother Jim's to-day'; and Uncle Charley would not make any reply, and Uncle Andrew would say, 'You damn dirty old fool, don't you know you ought to have better sense than to go there and see those people? You will allow those girls [having reference to Uncle Jim's daughters] to kiss and love you, and sponge all they can out of you; but it is not for love of you, but for love of your money, and, you damn old fool, you have not got sense enough to see through that.' . . . . Uncle Andrew repeatedly told Uncle Charles, 'Why, damn you, only for the way I went to court and lied like I did, and went around at the time of the lawsuit, you would not own one half of that property that you now own, that is your possession.' Charles would never make any answer. Uncle Andrew used to call Uncle Charles an old crawler. . . . . Generally in the morning we had a habit of getting up at half-past seven or a little later, and if my Uncle Andrew would get up before me, my Uncle Charley would say, 'How are you?' and I would say, 'All right.' 'Sleep good?' 'All right'; and my Uncle Andrew would be in

'the dining-room, and he would pull out a cat-o'-nine-tails and give me a good thrashing. I was not a bad boy, but was in bed. . . . . When I would talk to Uncle Charley about Andrew's licking me he would say, 'Don't let your Uncle Andy know that you are coming to me complaining; don't expect me to stick up for you, because you know how he abuses me; and if I should attempt to stick up for you in any manner, I would get the same as you get.' Uncle Andy would pull me out of bed and lick me. He did this about half a dozen times during the six months that I was there. . . . . I only heard Andrew call him a crawler from my bed. On no other occasion did I hear it. Uncle Charley appeared to me to be afraid of Uncle Andrew. Uncle Charley told me that he was afraid Uncle Andy would lick him if he would stick up for me. He says, 'Never ask me to stick up for you, because if I would make the least attempt to stick up for you when Uncle Andrew is beating or abusing you, I would get the same from him.'"

He also testified that his Uncle Andrew used to beat his children too, and that when his Uncle Charley said he had applied for letters of guardianship for him, the witness, Uncle Andrew abused them both, saying that his brothers and sisters were grown up and working, and able to support him (the witness), and he ought to go to them, and not to Uncle Charley; that he did not tell his father, or his brothers or sisters, about the beatings he received, only complained to Uncle Charley.

I think I have now made a full and fair statement of the contestants' case, and that the extracts given include all that can be claimed to bear upon the question whether Andrew McDevitt exercised or attempted to exercise any influence over the deceased as to the testamentary act. Does this testimony, admitting its entire truthfulness, taken in connection with the other uncontradicted evidence, make out a case for the contestants? I think it does not.

The other facts have been already suggested. They are the undoubted mental soundness of the testator,

the clear proof of his intelligent execution of the will, the fact that he alone instructed his attorney how to draw his will, and the entire absence of evidence that any pressure was brought to bear upon him at any time, by any one, in regard to the testamentary disposition of his estate. The scrivener did not know that any one else was aware that a will was contemplated. At all events, the decedent, unaided, gave him all his instructions. In fact, the only parties spoken to in regard to his testamentary intentions, so far as disclosed by the evidence, were the contestants themselves, except, perhaps, the witness Murray.

If efforts were made to prejudice the testator against the contestants, it is shown only by the testimony above set out, given by the younger Charles McDevitt. It had reference only to the children of James, with whom deceased had had trouble and litigation, and does not seem to have reference to testamentary favors which these children might expect, but to Andrew's fear that they were getting money from his brother Charles. It was three years, at least, before the execution of the will; but had they been made at the very time, they would not have been sufficient even then, of themselves, to throw the burden of proof upon the proponents, the mental competency of the testator being as clearly proven as in this case.

As to the statement that the testator lived in fear of personal violence from his brother Andrew, it is simply incredible. Nor is it necessary to discredit the witness to come to this conclusion. Allowing that he said all that the witness affirms, it shows that he very properly refused to interfere with the order maintained by Andrew in his own house, and his statement of fear was to to be rid of complaints. I understand the matter differently from the boy. To me it seems probable from the statements that his uncle approved of the punishment. What brutes it makes of both to suppose that Charles, when nothing had been said to him by Andrew about it, gratuitously believed that he, a man over sixty years of

age, would have been whipped with a cat-o'-nine-tails by his brother for merely suggesting that the boy ought not to be punished; why did Charles remain with Andrew if he was so constantly abused and lived in such fear? He was able to provide for himself. He had then another brother living in San Francisco, and many affectionate nephews and nieces. Some were living in his own house, and he is represented as saying that he considered it his home, and would go there to live but for his brother Andrew. If constantly called such opprobrious names and in fear, why did he not do so? Some people who are friendly still talk roughly, and we can only comprehend the condition here by supposing that these brothers were of that character. The evidence, however, removes all suspicion that Andrew attempted by flattery or simulated kindness to get the good-will of his brother, and steal his inclinations in that way.

The will is not an undutiful will. Not to divide property equally among nephews and nieces does not make it an inequitable will. An uncle is under no obligations, ordinarily, to provide for his nephews, either when living or by his will. Failure to name them in the will does not, under the statute, raise a presumption that they were forgotten. Circumstances may be such that failure to provide for one who is a stranger in blood may seem inequitable. No such circumstances exist here with reference to any of the contestants. It has been held, however, that the mere fact that children are unprovided for and the estate given to strangers does not throw upon the beneficiaries the burden of proving fairness. (Redfield on Wills, 526, and cases cited.) The will is not at variance with natural instincts. Charles McDevitt, the alleged testator, had no descendants, no one for whom a natural duty rested upon him to provide. He had quarreled with his brother James, and had had a lawsuit with him, which must have been somewhat bitter. From the testimony of young Charles McDevitt, we must infer that Andrew, in that quarrel, had been a

warm partisan of Charles. Soon after the trouble began, he went to live with Andrew, who apparently had just married. He remained with Andrew ten years, until his death, during which time he was generally more or less of an invalid, and several times was ill. At all these times, as during his last illness, he was cared for by Mrs. Andrew McDevitt. None of the contestants assisted or ever offered to assist in caring for him. Perhaps they had a valid reason for not doing so in their disagreements with Andrew about property. But nevertheless there is the fact. They were not present at these times of trial. The family of Andrew was present. Good feeling thus won does not invalidate the will, although the services may be rendered to induce testamentary favor. Five children were born in the house while the testator was an inmate. Contestants themselves concede that he was much attached to these children. He would have been less than human, and they most unattractive, if they did not get close to the old man's heart. For his board at the house of Andrew he never paid or offered to pay one cent. He required more money than he was getting for rents, to improve his property. He borrowed some three thousand seven hundred dollars from Andrew for this purpose. No part of this was ever paid, nor was any obligation given for it. Andrew was his only surviving brother, and the evidence only shows one sister, living in Massachusetts, whom he had not seen for years.

Is this will, executed under such circumstances, unnatural or inequitable? I think not. This being so, then I say that the testimony of the contestants, in connection with the clear and uncontradicted testimony that the will was dictated and executed by an understanding mind, in the absence of apparent restraint or influence, does not raise a presumption that Andrew McDevitt procured its execution by the use of undue influence.

We are not called upon to approve the will, and may regret that the boy Charles was not provided for; but

there was no duty resting upon the testator with reference to him, such as we would impute to a parent.

Although I do not think it of special interest here, it is well to remember that one has a right to make an unjust will, an unreasonable will, or even a cruel will. Generally, such questions turn our thoughts, as they are often intended to, from the only question at issue, which always is, only, is the will the spontaneous act of a competent testator?

Of course juries lean against wills which to them seem unequal or unjust. But the right to dispose of one's property by will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners, and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper.

General influence, not brought to bear upon the testamentary act, however strong or controlling, is not undue influence. There must be proof that the influence was used directly to procure the will, except in those cases where the beneficiaries or parties instrumental in having the will executed sustained a confidential relation to the testator. This case is not within the exception. In the long list of cases I have examined, the only further exception I find is, that it has sometimes been held that when a testator is weak, physically and mentally, and those having exclusive access to him have procured what may be called an unnatural will, — one which we would conclude would be against the natural instincts of the testator, — a presumption is raised against the will.

Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are

proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here. There is no proof. Circumstances have been proven which accord with the theory of undue influence, none of which are inconsistent with the hypothesis that the will was the free act of an intelligent mind. This does not amount to proof. And many circumstances are shown which are wholly inconsistent with the hypothesis of undue influence. And the presumption of law, in the absence of all proof, in a contest, is in favor of the will.

As to the order made after judgment, it is enough to say that I do not think this court should interfere with the action of the trial court.

I think the judgment and order denying a new trial should be reversed, and a new trial ordered, and that the order refusing to dismiss should be affirmed.

BELCHER, C., and VANCLIEF, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment and order are reversed. Motion to dismiss denied.