ESTATE OF MARY TOBIN, DECEASED.

[No. 13,988; decided February 12, 1895.]

**New Trial.—The Motion for a New Trial has Become in Practice** virtually a new trial—a fact which the court in this case comments upon.

**Testamentary Capacity.—An Intimate Acquaintance may Give His Opinion** respecting the mental condition of a testator; but he cannot give an opinion as to whether the testator possessed mental capacity to make a will.

**Will Contest—Burden of Proof Where Relatives are Omitted.—In** a contest of a will the burden is on the contestants, and the fact that relatives are ignored and the estate given to a stranger does not shift the burden.

Mary Tobin died on October 1, 1893, leaving a will dated July 21, 1891. James H. Kehoe was named as executor, and filed a petition for the probate of the will on October 4, 1893.

Thereafter a contest was filed by Catherine Kehoe, a sister of the testatrix, and others. The contest resulted in the will being sustained, and the same was admitted to probate and letters testamentary issued thereon to the applicant. Subsequently contestants moved for a new trial.

Charles J. Swift, for the proponent.

M. Cooney, for the contestants.

COFFEY, J. The motion for a new trial has become in practice virtually a new trial. Counsel deem it necessary, in the discharge of their duty, to rehearse the testimony and to belabor the witnesses with as much minuteness and energetic eloquence on the motion for a new trial as if they were engaged in demonstrating their original proposition that the testator was on the one hand a raving maniac, a victim of delirium from disease or drink, a gibbering idiot, a bedlamite from birth, or, on the other hand, that he was a marvel of mental salubrity and soundness, whose intellectual powers were always in perfect poise, and whose insusceptibility to influence was superior to all human power, ingenuity, cunning, art or artifice, even if opportunity existed to permit of

anyone's attempting to exert or exercise influence, due or un-
due. And this motion for a new trial is, through the in-
dulgence of the court, allowed to occupy as much time as the
original trial, if duly compressed by counsel, should have
consumed. Days are destroyed where hours, if economically
utilized, would have sufficed to present the issues; but if the
court say aught to assist counsel to expedite the trial it is
prejudicial error, and the waste of time is permitted to pro-
ceed without let or hindrance until a verdict is reached, which
is naturally unsatisfactory to the vanquished party. These
remarks are not peculiarly pertinent to the case at bar; they
apply generally, perhaps universally, under a practice now
become prevalent of retrying the case before the court, after
verdict, upon such a motion. Most cases of this kind are
where a will is set aside. This present motion is almost
unique, in that the will was upheld by a jury so unexcep-
tionable in its character and composition that the first twelve
citizens who filled into the box were accepted by both counsel
without question. So seldom does it happen that a will is
sustained by a verdict of a jury, that it is seriously proposed
by legislative bill to permit a probate of a man's will in his
lifetime. The logic of such a situation, if the situation be an
intolerable one (as has been well said in an epitome of ob-
jections to the legislative project, which I have been permitted
the privilege of reading and which I take the liberty of pre-
senting here in part), is either to prohibit the making of wills
altogether or to abolish the jury system; but it is plain enough
that if the jury system breaks down at one point it is apt
to break down at all points, and that if it be an inefficient
instrument in the matter of passing on wills, it must like-
wise be inefficient in the matter of passing on other litigated
questions of fact. Few persons, however, notwithstanding
cheap current criticism, would be in favor of abolishing our
jury system, which is one of the most valuable elements of
our civil and political life, and must have been so esteemed
by the contestants' counsel in this case when he exercised his
constitutional right to demand a jury trial.

This motion is made mainly upon the ground of the insuf-
ficiency of the evidence to support the verdict sustaining the
will. The errors of law assigned are in no single instance

tenable. A careful and candid review of the record author-
izes me to say that there is no error in the rulings of the
court.

Judging from the oral argument of counsel for contestants,
to which the court listened attentively, and from his points
and authorities which I have examined carefully, he seems to
think that the burden in this case lay upon his antagonist.
The authorities in California are to the contrary; and the
cases cited from other states by counsel are not to the pur-
pose. In going over the statement on this motion, it seems
to me that the contestants failed to make a case at all, and
that upon their own evidence, had the case been submitted to
the jury, respondent would have been entitled to a verdict.
There was scarcely a chance to catch "at a mere semblance
of evidence" (97 Cal. 653), to support the only issues upon
which any evidence whatever was attempted to be introduced,
to wit, unsoundness of mind and undue influence. Of the
four witnesses for contestants—Peter Kehoe, Catherine Kehoe,
Annie Cunningham and Katie Caulfield—the evidence of the
first bears more favorably for proponent than for the side in
whose favor he was called, apart from the natural bias of his
interest in the result of the controversy. (See throughout
his testimony, particularly pages 12 and 14 of statement.)

It was quite plain that when the testator made up her mind
to make a will she was in possession of her faculties, accord-
ing to this witness, her brother. He says:

"My sister told me she wanted to make a will and she
wanted Mr. O'Brien sent for. I told her that he was an old
acquaintance of mine. I did not tell her that she ought not
to make a will; did not say to her that she was not in a fit
condition to make a will. My wife went out to O'Brien's
house by order of my sister and my son's wife. O'Brien
came there about 9 o'clock in the morning; it may have been
earlier for all I know. My sister, Mrs. Tobin, could not know
O'Brien much at the time. I don't know whether it was on
the 20th [of July, 1891]; I am not positive as to the date.
He came there in the morning and wrote out a will in the
back parlor; what date it was I would not swear to; that was
the first time he said anything about a will. It was sup-
posed to have been a will; I never saw it. I didn't know

anything about the contents of the will. There was another occasion when a will was made. I was not there when the second will was made. I heard from Thomas M. O'Brien of the second will being made afterward. He told me he had written out another will, and had destroyed the first one."

One of the errors of law assigned by contestant was in connection with this witness' testimony: "Q. On the 21st, when the will was supposed to have been made, was your sister (the testatrix) of sufficient soundness of mind to make a will or transact any business?" The objection to this form of question was properly sustained upon the ground that it was a conclusion for the jury to draw from the evidence.

"Under section 1870 of the Code of Civil Procedure, the opinion of an intimate acquaintance respecting the mental capacity of a person is admissible, the reason for the opinion being given; but there is a wide difference between such an opinion and one as to whether a testator at the time of the execution of his will possessed the quantum of intelligence or mental capacity that in law is deemed sufficient to enable one to make a valid disposition of his property. The latter involves a question of law as well as of fact, and was in this case the very thing for the jury to determine from the evidence and under the instructions of the court.

"The precise question we are now considering was before the supreme court of Alabama, in the case of Walker v. Walker, 34 Ala. 470, and the court, in passing upon it, said: 'Capacity to make a will is not a simple question of fact. It is a conclusion which the law draws from certain facts as premises. Hence it is improper to ask and obtain the opinion of even a physician as to the capacity of anyone to make a will. Under our system that question was addressed to the jury. All evidence which tended to shed light on his mental status—the clearness and soundness of his intellectual powers—should have gone before them. This being done, however, the witness should not have been made to invade the province of the jury' ": Estate of Taylor, 92 Cal. 564, 28 Pac. 603.

This form of question was several times repeated to the witnesses and each time properly excluded.

It is clear from Peter Kehoe's evidence that the premises upon which he based his opinion that his sister, Mary Tobin, was not capable of making a will or transacting any business either on the 19th or 20th or 21st day of July, 1891 (his ingenious counsel finally managed to get into the record the objectionable answer in this shape), were not sound, and that his "reasons" did not support that conclusion; on the contrary, his conduct and conversation with her show that at the times indicated he believed her to be of sound mind; he says, "she was partly delirious most of the time" (page 15, statement), but yet he held a conversation with her about a will on the 18th or 19th when she spoke to him, but did not tell him in whose favor she wanted to make it (page 14, statement). She was not delirious at that time, nor does there appear anything in the evidence of this witness to show that she was "delirious" on the 20th or 21st, when the first and second wills were drawn by O'Brien; the contrary does appear as to the transaction of the 20th, and he was not present on the 21st. The opinion of this witness, Peter Kehoe, as to her incapacity to make a will at either time is destitute of reason or ground of any kind in its support. His reasons are, indeed, better calculated to support an opinion that she was of sound mind.

The evidence of Catherine Kehoe, one of the contestants and the sister of testatrix, yields nothing whatever on the point of the soundness of mind. If any inference be deducible from it at all, it is that Mary Tobin was of sound mind on the 20th and 21st, because she evidently was so on the 19th according to this witness. The witness says: "When I first saw my sister after the injury I did not talk much to her because she was not able to talk. When I went there on Saturday, after the injury, my sister was feeling better. She cried, and while Margaret was out of the room we talked about how friendly and affectionate we had been when we were living in the east; now it was different; she said we were always kind to one another, and glad to help one another; and these were the last words that passed between us; I kissed her and left the room, and did not see her again."

Mrs. Annie Cunningham gave cold comfort to contestants, her only testimony relative to the mental condition of testa-

trix being that "decedent was of a nervous temperament, but she was competent to manage her own affairs; plenty of nervous people are competent to manage their own affairs." This witness did not see the testatrix in July, 1891; did not visit her at the time of or subsequent to the injury or the date of the will, and therefore could not have an opinion as to decedent's mental condition at that time. (See page 28, statement.)

The fourth and final witness for contestants was Miss Katie Caulfield, niece of the testatrix. The sum and substance of her opinion on the sanity issue is: "The day after the date of this instrument, on the 22d of July, 1891, I formed an opinion as to the soundness or unsoundness of mind of my aunt, Mrs. Tobin, from the nervous state and pain that she was in, that her mind must be *impaired.*"

This falls short of an opinion that the testatrix was of an unsound mind, and is no answer to the only proper question, which is not as to *impairment* but as to *unsoundness* of mind—even if the opinion of this witness, if otherwise valuable, were of any weight as to the existence of the fact on the 22d, a date subsequent to the making of the will, plainly an afterthought.

This is the whole affirmative case for the contestants upon the issue of unsoundness of mind, the wheat having been winnowed from the chaff. It seems to the court scarcely sufficient to warrant a favorable verdict.

Upon the issue of undue influence there is next to no evidence that the will was made, or that any of its provisions was inserted therein, by reason of any undue influence.

The will here is a dutiful and natural disposition of the property of the decedent; the beneficiary had been brought up from a point of time anterior to her own earliest recollection as the daughter of testatrix and her husband; she had known no other parents; she was called by her father "Mamie Tobin," the name of testatrix, who was "the only mother she ever knew"; she was confirmed in her religion at the age of eleven years by the name of "Mary Elizabeth Tobin," the middle name being adopted at confirmation, and the name "Mary Tobin" being the only name that at that time she ever knew as her own, and it was years after before she

learned her true birth name, Margaret Montgomery; she worked from the time she was fourteen years of age for six years, six months each year, and gave her earnings to her "mother," as she considered her, and the remaining six months bestowed her services in the care of the household and sometimes in the field at mowing and the like, helping her "mother" in the domestic circle, as the old lady had grown feeble; three years after her "father" died she came with her "mother" to California, being her only companion, and so continued until her marriage with decedent's nephew.

It is true that this child was never adopted by legal process or procedure. This fact, however, rather strengthened the moral obligation to provide for her, after she had been reared in the impression of a subsisting natural relation, and this moral obligation testatrix faithfully carried out in the making of this testament. There was nothing in or about its execution from which could be drawn a legitimate inference of undue influence. The testimony is direct and positive that it was the free, voluntary and sane act of decedent. As to the execution of the will, the evidence of Mr. O'Brien, the draftsman of the document, is precise, straightforward and uncontradicted, and there is no doubt that all the conditions of the code were complied with; the other subscribing witness, Edward McGinnis, corroborates O'Brien in every essential particular (see page 52 et seq., statement). The attempt to make any point in this regard is far-fetched and vain. There is not a tittle of testimony tending to show that any prescription of the statute was unfulfilled in the execution of this instrument. Upon this question there was nothing to go before the jury.

It has been urged that the beneficiary here was a stranger in blood; but the supreme court has held that circumstances may be such that failure to provide for one who is a stranger in blood may be inequitable: Estate of McDevitt, 95 Cal. 31, 30 Pac. 101.

The fact that blood relatives are unprovided for and the estate given to a stranger does not shift the burden of proof: Redfield on Wills, 526.

This will is not at variance with natural instincts. On the contrary, decedent would have been less than human and this

beneficiary most unattractive if, in the peculiar circumstances of the case, she did not get close to her "mother's" heart, although that "mother" was not hers by nature: Estate of McDevitt, 95 Cal. 31, 30 Pac. 101.

The decedent was not bound to bestow her bounty upon brother or sister. Ordinarily there is no such obligation. Decedent obviously did not intend to do so, as she pointedly told her brother Peter, in answer to a remark of his about the will made on the 20th of July, 1891, just prior to the making of the will, that she "never intended to leave him anything" (see page 60, statement). She lived for over two years after making this will and never changed it nor expressed any design or intention to do so; it remained until October 1, 1893, the day of her death, her solemn declaration of what should be done with her property after her death, and it is not pretended that the temporary pains of the injury received on the 18th of July, 1891, protracted her delirium during that period.

The will is natural and equitable, the product of a sound mind unconstrained by influence, and, the evidence being palpably in its favor, the verdict of the jury should stand: Wachlin v. Town of Glencoe, 41 Minn. 499, 43 N. W. 967.

Motion for new trial denied.