## ESTATE OF BERTHA M. DOLBEER, DECEASED.

[No. 48; decided November 8, 1906.]

**Insanity of Testator—Burden of Proof.**—In the contest of a will on the ground of the insanity of the testatrix, the burden is upon the contestant to establish his contention affirmatively by a preponderance of evidence.

**Insanity of Testator.**—It is Presumed that a Person is Sane, and proof of insanity at one time carries no presumption of its past existence.

**Will Contest—Law of the Case.**—The decision by the supreme court rendered upon an appeal taken by a brother of the present contestant from a judgment against him in a contest of the will before probate, establishes the law governing this contest after .probate, so far as the facts in evidence are substantially the same as those involved on such appeal.

**Insanity of Testator—Opinion of Acquaintance.**—Section 1870 of the Code of Civil Procedure permits as evidence the opinion of an intimate acquaintance respecting the mental sanity of a person, but with that opinion must be given the reasons upon which it is based, and the opinion itself can have no weight other than that which the reasons bring to its support.

**Wills—Whether Unnatural or Unjust.**—The evidence in this case shows that the testatrix did not intend to provide for her next of kin as her estate had been derived from her father, between whom and her contesting kin there seemed to have been nothing in common, and the testatrix had never known or cared for the omitted relatives, and in the drawing of the will she had before her a copy of her father's will, which, as to many of the bequests, she followed

with a fidelity indicating a respect for what she must have conceived would have been his wishes; and the will itself contains nothing irrational or unnatural or opposed to ordinary notions of equity, but, on the contrary, is in accord with the sentiments of affection resulting from the intimacy subsisting between the testatrix and her beneficiary, who had been her companion and confidant from girlhood. Under such circumstances it cannot be contended that the will is at variance with natural instincts or justice.

**Testamentary Capacity—When Established.**—A review of the evidence as to the habits, characteristics, conduct, manner and testamentary capacity of the decedent, establishes that at the date of the execution of the will the decedent was in full possession of her faculties, and competent to execute a will.

**Undue Influence—Presumption and Burden of Proof.**—Undue influence cannot be presumed, but must be proved in each case, and the burden of proof lies on the party alleging it.

**Undue Influence—When Vitiates Will.**—The kind of undue influence that would destroy a will must be such as in effect destroys the free agency of the testatrix and overpowers her volition at the time of the execution of the instrument, and evidence must be produced that pressure was brought to bear directly upon her testamentary act.

**Undue Influence—What does not Amount to.**—Surmises and suspicions arising from opportunity and propinquity may be indulged in to an illimitable extent, but these do not constitute proof and must be disregarded by the court. The evidence in this case shows that the testatrix, at the time of executing her will, was unconstrained by undue influence, and is entirely in favor of the respondents.

Bart Burke, C. J. Pence and D. C. De Golia, for contestant Horatio Schander.

G. W. McEnerney, for Etta M. Warren.

E. S. Pillsbury, for W. G. Mugan, executor.

J. H. Mayer, for certain legatee respondents.

COFFEY, J. This is an application by Horatio Schander, an uncle and one of the next of kin and heirs at law of decedent, to revoke the probate of an instrument filed in this court on July 18, 1904, purporting to be the last will of Bertha M. Dolbeer, executed on April 23, 1904, and admitted to probate on the 22d of December, 1904.

The issues tendered by the grounds of contest are (1) the incompetency of the decedent to make a last will and testament; and (2) that the decedent was unduly influenced by Etta Marion Warren, the principal beneficiary, to execute the alleged will.

The contest came on for trial on the 29th of August, 1906, and the contestant introduced to support his theory of the case several witnesses, among them the main beneficiary, Miss Warren, Miss Ethyl Hager, Mrs. May Moody Watson, Raymond Hoff Sherman, Mrs. Margaret H. Warren, Miss Frances Stewart, Mrs. Elizabeth C. Phillips, Mrs. Margaret Nelson Bresse, Mrs. Angela Brunson, Mrs. Hilma Carson, George H. Tyson, John Cotter Pelton, Thomas Saywell, William Gordon Mugan; and, under stipulation, the testimony of certain witnesses in New York taken by deposition and ruled out in the former contest of Adolph Schander, which it was agreed would be the same if taken in this trial.

I. As to the first issue, the unsoundness of mind of decedent at the time of making the will dated April 23, 1904, respondent claims that this was disposed of in the contest instituted by Adolph Schander by the decision of the supreme court rendered May 18, 1906, which declared that the evidence then produced was absolutely insufficient to have justified the submission of the issue to a jury.

Upon the issues presented the burden is upon the contestant to establish affirmatively and by a preponderance of evidence the unsoundness of mind of testatrix at the time of making the will, and the evidence is to be considered in view of this burden which the law casts upon him. The presumption always is that a person is sane. Proof of insanity carries no presumption of its past existence. It exists only from the time it is proved to exist. This is the law as declared by the appellate court in the appeal of Adolph Schander; but contestant in this case says that the decision in that contest does not apply here, since every case makes its own law. So far, however, as the facts in evidence are substantially the same, it should seem that the principles stated by the supreme court should control the conclusion of this court, and I cannot discern any material difference in the testimony dealt with in detail by the appellate tribunal and that taken in this

trial. Mrs. Phillips appears to have been the main reliance of contestant, who claims that her testimony is superior to that of a hundred witnesses such as those who testified on the other side;.she was in place of a mother to her from decedent's childhood and knew the whole family history, and was most competent to express an opinion, but the supreme court held that this witness' opinion had no probative value in the other contest, and the reasons for that remark are applicable here, since her evidence is not essentially different. Mrs. Phillips thought that Hannah Dolbeer, the mother of Bertha. was of unsound mind when she was carrying the latter; after the death of the mother she took charge of the children immediately and remained in the home on Lombard street for six years; after she left the German nurse took charge, and then Miss Millie Stewart had care of them; subsequently Miss Warren came into the family when Bertha was about eleven years old. Mrs. Phillips describes Bertha Dolbeer as of a quiet, undemonstrative nature; she never made any confidant; she complained of her eyes and of her head about a year before her death; Bertha's manner was so quiet that one could not say she was nervous. Mrs. Phillips noticed that her mind was not concentrated. When John Dolbeer died this witness was sent for and saw Bertha, who spoke of the shock the event gave her; she never acted nervous. After Mrs. Phillips returned from Eureka, Nevada, she saw Bertha frequently and their relations were always intimate; she occasionally said that life was not worth living without health; she was subject to periods of depression,.and Mrs. Phillips did not think she was of sound mind in April, 1904, because of her moods, her lack of interest in life; she was unlike her former self. This witness spoke to Bertha about her father's will and the just manner of his disposition and that she ought to be proud of it, and she answered that she was. Witness did not know whether Bertha ever had a love affair or whether she had any sentimental relations with anyone. Attended her funeral, but did not see her remains. Received one letter from her when she went away, did not preserve it; the purport of it was that the writer was not any better. Her letter to Mr. Mugan from Paris was to the same effect; she wanted to come home. Mrs. Phillips saw that letter in

Mr. Mugan's office; remembered it because it made her feel so bad; Bertha's letter to witness was from the steamer; the first she wrote. The last time she met decedent was at her father's house for about fifteen minutes just prior to her departure for Europe; it was about noon; it may have been the day before; generally speaking, Bertha was discreet, reticent, secretive, kind, shy. Mrs. Phillips said that to her knowledge neither Horatio nor Adolph Schander visited the Dolbeer house after a few weeks from the death of Mrs. Dolbeer. Mrs. Phillips' grievance against the instrument seemed to be the comparative smallness of the bequest made to her. She had said to one of the executors that she should have as much as $25,000, the amount bequeathed to Miss Warren's mother, but she denied that she demanded that amount, but the spirit of her remark was, as she testified, that she thought her bequest was small compared with that to a stranger. She had said that all she cared for was money, but that was on account of her circumstances. She thought the case ought to be compromised on account of the family name; she had facts in her possession unknown to contestant sufficient, if revealed, to break the will, but she wanted to save all trouble and to avoid the ignominy of having domestic history exposed on the trial; so she was working for a compromise; she desired that the matter should be adjusted without recourse to the courts.

It is fair to infer from the testimony of this lady that if her legacy was as large as that of the mother of Miss Warren, or if she received $25,000 by way of compromise, her opinion would have been materially modified; but, aside from this, an examination of her evidence discloses no fact justifying a deduction of unsoundness of mind at the date of making the will, nor at any other time, within the knowledge of the witness, and it is apparent, from her own statements, that Mrs. Phillips in her intercourse with decedent always treated her as a rational person, possessed of sound judgment, up to the last time she saw her, just prior to Bertha's departure for Europe. Her own summary of the character and characteristics of the testatrix shows that she exercised discretion, self-control, attention to her own affairs, capacity of considering the disposition of property, knowledge of what her father had done, and appreciation of the quality of his testamentary act;

"she never acted nervous"; she was a secretive girl; did not discuss her affairs with others; was reticent.

It is said by contestant that the respondent was not treated by John Dolbeer as a member of the family, but as an attendant and companion of and for his daughter; she entered into that house in that capacity and she formed the design from the start to obtain the money. As long as the father lived she kept her place, but when he died she became the master of the situation, and on his death in 1902, Bertha was absolutely at her mercy, and she carried out her carefully concocted scheme to control the mind of her charge; and the physical condition of testatrix contributing to her mental malady, the task of the schemer was rendered easier; but opposed to this argument is the will of John Dolbeer, who describes Miss Warren, in leaving her a legacy, as one "who has been for a number of years and is now a member of my family."

In commenting on this clause the supreme court has remarked that John Dolbeer's family at that time consisted in law strictly of himself and his daughter, and this inclusion of Miss Warren as a member of his family is not without its significance. This relation continued after his death and down to the decease of testatrix. The fact that she was a stranger in blood does not impair her standing, for our supreme court has held that circumstances may be such that failure to provide for one in such a position may be inequitable: Estate of McDevitt, 95 Cal. 31, 30 Pac. 101. The will is not at variance with natural instincts; on the contrary, it is in accord with the natural sentiments of affection resulting from the intimacy subsisting between the testatrix and the beneficiary, who had been her companion and confidant from girlhood. The decedent was not bound to bestow her bounty upon her relatives; ordinarily, there is no such obligation. Testatrix obviously did not intend to do so; her own statements show no disposition to favor the contesting kin. Her estate had been derived from her father, between whom and the mother's people there seemed to have been nothing in common, and the testatrix had never known or cared for the omitted relatives, and moreover, as pointed out by the appellate court in the contest of Adolph Schander, in the drawing

of the document in dispute she had before her a copy of her father's will, which, as to many of the bequests, she followed with a fidelity indicating respect for what she must have conceived would have been his wishes.

There is nothing in the instrument itself irrational or unnatural or opposed to ordinary notions of equity; and there can be no other conclusion from the evidence of the witnesses called by contestant than that on the day of the date of the paper—April 23, 1904—she was in full possession of her faculties. About fifteen witnesses were examined for contestant, and the sum of their testimony is that testatrix was a bright and accomplished young woman, fond of outdoor sports, swimming, bicycling, equestrian exercise, an expert manager of automobiles, she was interested in social affairs, entertained her friends frequently, attended parties, indulged in dancing, and enjoyed society generally during the season. By all accounts she was an attractive personality, and an agreeable addition to the company of those with whom she chose to associate.

One of the witnesses called by contestant knew decedent for about ten years and described her as normal. She complained of headaches sometimes and spoke of liver troubles, and had some difficulty with her eyes and bad headaches on that account, but after she procured certain eyeglasses she was relieved and had no further trouble on that score. This witness described decedent as phlegmatic, self-composed, most unexcitable, never saw her excited; she was intelligent and educated, fond of reading; seemed happy; always the same; in all her conversations she appeared to be rational and absolutely of sound mind. She was not destitute of domestic tastes and aptitudes; was a good seamstress and busied herself a great deal with the needle; had fine taste in dress and selected her own apparel after she was sixteen.

It is asserted by contestant that the physical condition of decedent contributed to her mental malady. It does not appear, however, from the evidence that her mind was at all affected by any corporal ailment. It is true that she was treated by Dr. Parson for some trouble of the liver, but during the time she was taking his treatment she appeared to be well—took exercise, long bicycle rides to the park in company

with her young lady friends. This doctor treated her for about two months. She had also some complaint for which ·Dr. Lewitt prescribed, and she suffered from insomnia beginning in the autumn of 1893, for which she administered some medicaments, but it was nothing very serious; she was not depressed, not restless or nervous; she did suffer from constipation, but during that period she received many visitors at her home in the evening, engaged in social conversation, played pool, and in various ways passed the time in agreeable intercourse with her friends, none of whom detected in her any symptoms of insanity. When she took the rest cure, it seems to have been the result of exhaustion produced by excessive attention to social obligations, and not from any mental disturbance.

Dr. Moffitt, who is described as a diagnostician, visited her at her home about three times a week for a while; but while she was somewhat secluded and resting from the excitements of society life, her intimate acquaintances visited her without hindrance; and for a considerable time prior to making the will she was entirely exempt from the attentions of physician or nurse.

Up to the time of the testamentary transaction and at that time there is no testimony tending to establish the theory of unsoundness of mind. Afterward, on the trip to Europe, it appears that she contracted a cold going over on the steamer,. but she had improved by the time of her arrival in Paris. Still she was not feeling very well there and received some medical treatment for nervousness from Dr. Gros, who said she had "neurasthenia," but he did not say it was a severe case. She was nervous on her return in New York, but her companion was not apprehensive about her. As to the cause of her death, whether self-inflicted or accidental, there is no certainty in the record, but it is certain from the evidence that at the time of executing the will she had testamentary capacity.

This conclusion could be reached without examining the evidence for respondents, which is replete with proof as to the integrity of her mind at and about the time of the transaction. Some sixteen witnesses, intimately acquainted with her, testify that testatrix was a woman of strong mental

caliber, of good disposition, calm, quiet, self-possessed, never ruffled, not nervous, very cheerful, expert at exercise, always rational in conduct and conversation. These were not persons who met her casually, but who saw her day in and day out, at home and abroad, and who were her constant companions, some of whom had known her from childhood, and who were in the habit of daily association with her in familiar intercourse; they concur in testimony that she was a person of more than average intellect; one says she had an active brain, an alert eye, a good nerve, and was always pleasant. This is the tenor of their testimony, and it is entitled to great weight as to her general character and capacity. In addition, the evidence of the subscribing witness is uncontradicted and must be accepted.

The instrument, having been entirely written, dated and signed by the hand of the testatrix herself (Civil Code, section 1277), did not need attestation, which she is presumed to have known; but she took the precaution to secure two witnesses, and in their presence executed it with all the formalities required by the statute (Civil Code, section 1276). Besides this she made in her own hand a copy and placed it in a sealed envelope, indorsing it ''last will and testament of Bertha M. Dolbeer,'' and on the Monday after the attestation she deposited it in the office safe of Dolbeer & Carson, taking therefrom another will which she had deposited a year before. The original she left in the California Safe Deposit vaults where it was found after her death, when the envelope containing the copy was opened; the copy had appended to it a memorandum setting forth where the original could be found, all in her handwriting. There is nothing in this to indicate insanity, but everything to demonstrate a well ordered and strongly balanced mind.

II. As to the second issue—undue influence—the argument of counsel for contestant is that the paper was the product of the scheming of Mugan, one of the executors, and the principal beneficiary, Miss Warren, and he undertakes to give the genesis of the document and to show how it was developed from the suggestion of this executor, and, in support of this theory, contestant adverts to the surroundings of testatrix during the last months of her life, and asks,

when, where, and how was this instrument written, seven pages of the original and a copy, almost a facsimile, in her handwriting? Contestant asserts, in answer to his own question, either Etta Marion Warren wrote that or she sat at the bedside of Bertha Dolbeer and controlled her hand in writing it during the night of the 22d of April; for it was impossible that decedent could have written it on the 23d of April; but there is no evidence whatever to justify this extraordinary assumption, and the proof is plenary to establish the contrary. Contestant endeavors to discredit the testimony of the subscribing witnesses, Douglas and Arthur Watson, because the latter added unnecessarily the date of the execution to the will, it having been already inserted by the testatrix, which the witness seemed to have overlooked, and counsel considers this a novel feature, calculated to throw doubt on the authenticity of their account of what occurred, and asks, why did not decedent call his attention to that fact? Clearly, this does not call for comment, in view of all the evidence in favor of the truth of the transaction.

Counsel denounces the whole case as a very carefully concocted plot, and declares that the entire cunning, connived plan shows it to have been devised by a matured legal mind, and that all the circumstances establish a conspiracy in which Mugan and Miss Warren were chief actors, aided by William Wilson Carson and others; but this is asserton and not proof, and the law is that undue influence cannot be presumed, but must be proved in each case, and the burden of proof lies on the party alleging it, and, in this contest, there is no evidence sufficient to warrant the allegation of contestant. The kind of undue influence that would destroy the testament must be such as in effect destroyed the free agency of the testatrix and overpowered her volition at the time of the execution of the instrument, and evidence must be produced that pressure was brought to bear directly upon the testamentary act; and there is no such evidence in this case. Surmises and suspicions arising from opportunity and propinquity may be indulged in to an illimitable extent, but these do not constitute proof, and must be disregarded by the court.

The evidence on each and both of the issues being the same in effect, it is not necessary to repeat what has been said.

The decedent at the date of writing the instrument and of executing it in the presence of witnesses was of sound mind, unconstrained by undue influence, and the evidence being entirely in favor of the respondents, the petition of contestant should be and it is denied.

The Principal Case was before the supreme court on appeal in 149 Cal. 227, 86 Pac. 695, and in 153 Cal. 652, 96 Pac. 266. It was also before the superior court in Estate of Dolbeer, ante, p. 232.