[No. 19565. Department Two.—September 3, 1895.]

ESTATE OF CHARLES E. LANGFORD, DECEASED. MARY J. HERWICK ET AL., RESPONDENTS, *v.* MARIA M. LANGFORD, APPELLANT.

CONTEST OF WILL—FRAUD—UNDUE INFLUENCE—FINDINGS AGAINST EVI-
DENCE.—Where, upon the contest of a will and codicil, the jury have found that the decedent was of sound and disposing mind and memory, but that the will and codicil was procured by the fraud and the undue influence of the widow, the findings as to fraud and undue influence are unsupported by the evidence if there is nothing in the evidence to sup-port the alleged fraud, and the facts and circumstances directly attend-ant upon the execution of the will and forming part of the *res gestæ* show that the testator was not then unduly influenced, but was acting with perfect freedom and following his own uncontrolled wishes, and understood perfectly what he was doing.

ID.—WORK ON FAMILY RESIDENCE—INSTRUCTIONS BY WIFE.—The wife has a right to have a voice in the matter of the family residence, and evidence that the wife, between the time of the execution of the will and codicil, gave some instructions in reference to work done on the family dwelling-house, and that the husband gave no instructions in reference to the work, has no significance upon the question of undue influence of the wife over the husband.

ID.—DEFERENCE OF HUSBAND TO WIFE—CONTROL BY HUSBAND OF GEN-
ERAL BUSINESS.—The testimony of two witnesses as to the deference of the husband to the wife in trivial domestic affairs cannot prove general undue influence by her over the husband where the evidence of many witnesses brought into close relation with the deceased and his family shows that he managed his business wisely, and made shrewd bargains, and transacted all his business himself, and that the relations between deceased and his wife were as pleasant and cordial as those usually existing between husband and wife, and where there is no proof that

the deceased was either afraid or under any unusual influence of the
wife.

ID.—DECLARATIONS OF TESTAMENTARY INTENT—CONTRADICTION OF WILL.—
Declarations of the decedent about his testamentary intent, consisting,
of the testimony of his children by a former marriage, much of it being.
remote from the time of the execution of the will, in regard to the·
division of his property among his children, at a time when he had
already made a will which he never changed as to them, in which he had
given them only a certain part of his property, and which he afterward
solemnly republished when he made a codicil thereto, have no value to
overcome direct proof that the will was freely executed.

ID.—INTENTION OF TESTATOR AT TIME OF DECLARATIONS.—It is immaterial
whether at the time of declarations made by the testator to his children
he intended to deceive them, or intended to execute a new will, and
such declarations have no weight unless introduced in connection with
evidence tending to prove undue influence, mental incompetency, or
fraud at the time of the testamentary act.

ID.—SECOND MARRIAGE—DIVORCE FROM FORMER WIFE—INADMISSIBLE
EVIDENCE OF DECLARATIONS.—Where the testator had been divorced
from his former wife, the mother of the contestants of the will, and was
married to his second wife many years before the execution of the will,
testimony of the contestants as to declarations made by the decedent to
them, and as to their conversations with him before, at the time of, and
shortly after his second marriage, reflecting upon her character and
influence over the husband, is too remote in time to be admissible for
any purpose, and the admission of such evidence is prejudicial error.

ID.—PROOF OF UNDUE INFLUENCE—SUSPICION—SPONTANEOUS ACT OF TES-
TATOR.—In order to prove undue influence, it is not sufficient to raise a
suspicion of it, but the evidence must amount to proof of undue influ-
ence; and such evidence has the force of proof only when circumstances.
are shown which are inconsistent with the claim that the will was the·
spontaneous act of the testator.

ID.—HUSBAND AND WIFE—PRESUMPTION—VALIDITY OF WILL—INFLUENCE.
OF WIFE.—There is no presumption of undue influence in the relation
of husband and wife against the validity of any provision which a hus-
band may make in a wife's favor; and she may justly influence the·
making of her husband's will for her own benefit or that of others, so
long as she does not act fraudulently, or extort benefits from her hus-
band when he is not in a condition to exercise his faculties as a free
agent.

ID.—INTEREST AND OPPORTUNITY NOT SUFFICIENT—OVERPOWERING OF.
VOLITION.—The presumption of undue influence is not raised by proof
of interest and opportunity alone; but, in order to set aside a will for·
undue influence, there must be substantial proof of a pressure which
overpowered the volition of the testator at the time the will was made.

ID.—NATURALNESS OF WILL.—The consideration of the question whether
or not a will is unnatural, or different from what might be expected, is
of no importance, except in a case where there is evidence immediately
tending to show mental incompetency, fraud, or undue influence in-
ducing the testamentary act, in which event it may serve to help out a
weak case; but a will cannot be upset because in the opinion of·a jury
or court it is unnatural.

CVIII. CAL.—39

ID.—RIGHT OF DISPOSITION BY WILL—APPROVAL OF WILL BY JURORS.—
The right of disposition of one's property by will, the policy of which
has been sanctioned by the wisdom and experience of many generations,
cannot be frittered away after the death of the testator according to the
tastes and notions of others, in the absence of a change of the law by
the legislature; and it is not necessary that the provisions of the will
should meet with the approval of jurors.

APPEAL from a judgment of the Superior Court of
Los Angeles County and from an order denying a new
trial. W. H. CLARK, Judge.

The facts are stated in the opinion of the court.

*A. R. Metcalfe,* and *Anderson & Anderson,* for Appel-
lant.

Declarations not made at or so near the time of the
making of the will as to be part of the *res gestæ* do not
tend to prove that the will was procured through undue
influence; and where the testator is of sound mind,
they are entitled to no weight at all, in the absence of
proof as to undue influence of the very testamentary
act. (*In re McDevitt,* 95 Cal. 25; *Waterman* v. *Whitney,*
11 N. Y. 157; 62 Am. Dec. 71; 1 Redfield on Wills, 528;
*Herster* v. *Herster,* 122 Pa. St. 239; 9 Am. St. Rep. 100.)
Evidence as to family jars is no ground for impeaching
the will. (*McMahon* v. *Ryan,* 20 Pa. St. 329, 331.) The
influence of the wife, not inconsistent with her wifely
position and duty, is not admissible to establish undue
influence. (*Storer's Will,* 28 Minn. 9.) Undue influ-
ence must amount to coercion destroying free agency
as to the very act. (*Goodwin* v. *Goodwin,* 59 Cal. 560;
*In re McDevitt, supra; Estate of Carpenter,* 94 Cal. 407; 1
Redfield on Wills, 3d ed., 534; *In re Hess' Will,* 48 Minn.
504; 31 Am. St. Rep. 665; *Herster* v. *Herster,* 122 Pa. St.
239; 9 Am. St. Rep. 95; *Eckert* v. *Flowry,* 43 Pa. St. 52;
*Wainwright's Appeal,* 89 Pa. St. 220; *McMahon* v. *Ryan,*
*supra.*) There is no presumption against any provision
that a husband may make for his wife. (*Latham* v. *Udell,*
38 Mich. 238; note to *In re Hess' Will, supra;* note to
*In re Richmond's Appeal,* 21 Am. St. Rep. 98.) The

testimony seeking to besmirch the widow many years before the making of the will was not proper. (*Estate of Flint*, 100 Cal. 391; *Pierce* v. *Pierce*, 38 Mich. 419; *In re Hess' Will*, supra; *Batchelder* v. *Batchelder*, 139 Mass. 1; *Mitchell* v. *Donohue*, 100 Cal. 202; 38 Am. St. Rep. 279; *Waterman* v. *Whitney*, supra.)

*R. A. Ling*, *H. H. Appel*, and *H. T. Gordon*, for Respondents.

The evidence is sufficient to warrant the finding of the jury, since the testamentary declarations of the testator are inconsistent with the provisions adopted by him, and the will is unjust and unreasonable. (*Tyler* v. *Gardiner*, 35 N. Y. 559; *Harvey* v. *Sullens*, 46 Mo. 147; 2 Am. Rep. 491; *Neel* v. *Potter*, 40 Pa. St. 483.) Fraud may be proved by circumstantial evidence. (Cooley on Torts, 475; *Watkins* v. *Wallace*, 19 Mich. 57; *McDaniel* v. *Baca*, 2 Cal. 326; 56 Am. Dec. 339; *Waddington* v. *Loker*, 44 Mo. 132; 100 Am. Dec. 260.) Undue influence may be exercised by mental as well as physical coercion. (Schouler on Wills, sec. 227; *Haydock* v. *Haydock*, 33 N. J. Eq. 494; *Layman* v. *Conrey*, 60 Md. 286.) Where authority is used to direct how to make a will, and to produce a will in which the person exercising the influence is principal legatee, it is undue influence, and the will cannot be supported. (*Marshall* v. *Flinn*, 4 Jones, 199.) Expressions of fixed purposes and intentions at variance with the provisions of the will have weight in determining the question of undue influence. (*Dye* v. *Young*, 55 Iowa, 433; *Stephenson* v. *Stephenson*, 62 Iowa, 163.) An inequitable distribution of property tends to show undue influence. (Schouler on Wills, sec. 238; *Fountain* v. *Brown*, 38 Ala. 72; *Harold* v. *Harold*, 1 Davis, 203; *Waters* v. *Cullen*, 2 Bradf. 354.) Where an unjust will is the offspring of the influence of a wife over her husband, it cannot be maintained. (*Taylor* v. *Wilburn*, 20 Mo. 306; 64 Am. Dec. 186.) Whenever undue influence is exercised by any one over another, and he gains by its exercise, the will is worth-

less. (*Carroll* v. *Hause*, 48 N. J. Eq. 269; 27 Am. St. Rep. 469.) A wide range of inquiry into the family relations and the terms upon which they lived is allowable. (*Beaubien* v. *Cicotte*, 12 Mich. 459.) A strong circumstance to show undue influence is the exclusion of a daughter who is in need of aid. (*Reynolds* v. *Root*, 62 Barb. 250.) The fact that the will in question displays an entire change of former intention is strong evidence of undue influence. (*Tyler* v. *Gardiner*, 35 N. Y. 559.) The unnatural character of the will is always to be considered. (*Kevil* v. *Kevil*, 2 Bush, 614; *Carpenter* v. *Calvert*, 83 Ill. 62.) The law presumes fraud as between husband and wife. (*Taylor* v. *Wilburn, supra; Boyes* v. *Rossborough*, 6 H. L. Cas. 2, 47.) The question of fraud and undue influence being a question of fact for the jury, and there being evidence to sustain the verdict, the verdict will not be disturbed. (*Estate of Mc-Carty*, 58 Cal. 335; *Estate of Dalrymple*, 67 Cal. 444.) Fraud and undue influence may be inferred from circumstances without direct proof. (*Sears* v. *Shafer*, 6 N. Y. 268; *Delafield* v. *Parish*, 25 N. Y. 96; *Ross* v. *Miner*, 67 Mich. 410; *Prentis* v. *Bates*, 93 Mich. 234; *O'Donnell* v. *Segar*, 25 Mich. 367; *Porter* v. *Throop*, 47 Mich. 313; *Baldwin* v. *Robinson*, 93 Mich. 438.)

McFarland, J.—This is an appeal by Maria M. Langford, widow of Charles E. Langford, deceased, and proponent in the lower court of his last will, from a judgment denying probate of said will, and from an order denying her motion for a new trial.

The probate of the will was contested by children of the decedent by a former wife, upon the grounds that he was mentally incompetent to make a will, and that it was procured to be made by the fraud and also by the undue influence of appellant. In answer to interrogatories propounded to the jury they found that at the time of the execution of the will and also at the time of the execution of a certain codicil, the decedent was of sound and disposing mind and memory, but that it was

procured by the fraud and also by the undue influence
of the appellant.

The finding of fraud may be dismissed with the re-
mark that there is no evidence to support it. The
alleged fraud was that the appellant falsely and fraudu-
lently represented to the decedent that the contestants
cared nothing for him, had no love for him, and only
wanted his money. There is nothing in the evidence to
support these averments.

As to the finding of undue influence, the contentions
of appellant are that there is no evidence sufficient to
justify it, and that the court committed material and re-
versible errors in rulings upon the admissibility of evi-
dence on that issue; and we think that both contentions
must be sustained.

The decedent and appellant were married in Fulton,
Illinois, in 1873. They resided there several years and
then removed to Pasadena, California, where they re-
sided until his death, and where the will was made.
There can be no pretense that there is evidence of any
direct influence exercised by appellant or any other per-
son over the decedent at the very time of the execution
of the will, and affecting the testamentary act, or con-
stituting part of the *res gestæ*. To all appearances, and
as far as the circumstances in proof show, he was acting
with perfect freedom, and following his own uncon-
trolled wishes. The will was executed on November 29,
1887. Two or three weeks prior to that date he went to
the law office of Winslow & Hester, at Pasadena, and,
after some conversation with Mr. Winslow, who was in
very bad health, the latter introduced him to Mr. Frank
J. Polley, who was a young lawyer then in the employ
of Winslow & Hester, with the request that he (Polley)
should draw a will for the deceased. The appellant had
no acquaintance with Polley, Winslow, or Hester. Pol-
ley never saw her until the trial of this cause, which
was over six years afterward. After Winslow had turned
over to Polley the business of the preparation of the
will, the decedent visited the office several times and

had conversations about the matter with Polley. He always went to the office alone. Mr. Polley testified: "At such visits we conversed about the will. Our conversations were almost entirely in relation to the will, and related to the different provisions. Each provision in the will was requested by Mr. Langford. . . . . At the time Mr. Langford executed the will I do not think he was acting under any threat, menace, misrepresentation, nor fraud, nor undue influence that I know of; positively he was not, so far as I am concerned. At that time Mr. Langford's mind was, I think, unusually clear. I had numerous conversations with him during the time I was drawing the will; he understood perfectly what he was doing." The will was completed and executed on November 29th, and was witnessed by Polley and Mr. Hester, who had been most of the time in the city of Los Angeles attending to legal business there, but was at home on that day. The deceased took the will away with him, and it was found in his box at the bank a few days after his death. Both the subscribing witnesses testified at the trial. About three years afterward—on January 29, 1890—he made a codicil to the will. In the original will he left no property to his daughter, Mabel, but left "her future welfare in the hands of my said wife, in whom I have full confidence that the dictates of a mother's love," etc.; and the codicil merely provided that, should his wife die before his death, the property devised to her should go to Mabel. This codicil was also drawn by Mr. Polley, who at that time was doing business as a lawyer for himself. He testified: "Mr. Langford came into the office and asked me to draw a codicil. He stated his wishes in reference to it. . . . . At the time Mr. Langford was not acting under fraud, menace, threats, or undue influence, so far as I know." He also testified that "at the time he went over his financial affairs with me, talked about different matters, and said that now he thought he had his affairs in good shape. We had quite a long talk about his property, and his business relations with parties during the

boom." He also testified that deceased read over the
codicil, and that his mind was sound and strong.    The
codicil was witnessed by Polley and by a Mr. Wetherby,
who was doing business in the house in which Polley
had his law office, and who was called in by Polley to
witness the execution of the codicil.    Wetherby was a
witness at the trial.

So far, therefore, as we are to be governed by the facts
and circumstances directly attendant upon the execution
of the will and codicil and forming part of the *res gestæ*,
we are inevitably forced to the conclusion that the tes-
tator acted with a perfectly free volition.    This is not
the case where a man makes a will upon his deathbed,
surrounded by those who turn out to be his devisees;
nor is it a case where a weak person at the time of the
execution of his will is teased and tormented by the
importunities of relatives who do not allow him to be
out of their sight, or to have any opportunity for quiet
thought or independent advice.    In the case at bar the
testator, as found by the jury, was of sound mind; when
he concluded to make a will he went entirely alone to
his attorneys, with whom he had various conversations;
and he had ample opportunity to fully and freely think
out what he wanted to do, and to change any conclusion
which he might have arrived at, if he so desired.    There
is not a single suspicious circumstance immediately con-
nected with the execution of the will or the codicil.
What, then, are the other facts in proof which present
the alleged basis for upsetting this will?

The contention of respondents, when thoroughly sift-
ed, seems to be about this: That there is evidence to
the point that appellant had a *general* influence over the
deceased which ought to be classified as "undue"; and
that, therefore, although when he made his will, under
the circumstances above stated, he was apparently free
to act as he pleased, yet it must be inferred that this gen-
eral influence of appellant accompanied him, subverting
his volition and coercing him to act against his real
wishes.    To maintain such a strained and difficult theory

would require evidence very different from that presented in the record.

As to the evidence relied on of occurrences which took place at any point of time reasonably near the time of the execution of the will, they are substantially these: The witness McCarty testified that in 1888, about a year after the execution of the will and two years before the date of the codicil, he worked on a dwelling-house that decedent was building. A Mr. McKenzie was foreman of the work; and the substance of McCarty's testimony is in these words: "I saw Mr. and Mrs. Langford there, and Mrs. Langford gave some instructions in reference to the work. Mr. Langford did not give any as I know of." There is no significance whatever in this testimony; the wife had a perfect right to have a voice in the matter of the family residence. There is also the testimony of the witness Irish, who worked for the deceased during a period between 1889 and 1892, and was discharged. This was long after the execution of the will, but included the date of the execution of the codicil. His testimony was directed principally to an attempt at showing that the deceased was not of a strong mind. As to the question of "influence," he stated that Mr. Langford gave him his instructions, but that "sometimes he would tell me that Mrs. Langford wanted this done; that she wanted it done this way, or she wanted it done that way. Different times while I was there, why he would say that Maria—he most always called her Maria to me—wanted the lawn mowed, or the flowers fixed, or the driveway fixed, or something of that kind." He was asked by respondents if, from his observations, the deceased "appeared to you to be in fear of his wife"; and his answer was as follows: "Well, I could not answer that; he always seemed to want to—didn't never —he always seemed he didn't want to displease her in anything—in no way displease her. I do not remember of any instance of him expressing himself in reference to pleasing or displeasing her, it may come to my memory. I know that Mrs. Langford went east." He was

then asked directly if he noticed "any change in Mr. Langford's conduct while she was east," and he answered yes, that he seemed to be more jovial and friendly. He also testified that when Mrs. Langford was about to return home deceased told him that he must "clean up," that "you know when Maria gets home everything will have to be renovated," and that "its a case 'when the cat's away the mice will play.'" He also testified that when he was discharged the deceased "stated that he would have to let him go on account of Mrs. Langford's account."

The foregoing is about all the evidence as to any occurrences which took place near the time of the execution of the will or codicil, apart from certain alleged declarations by the deceased of testamentary intent, which will be noticed hereafter. There was, however, the testimony of the witness Reinke, who was a hired man of deceased for a period commencing in 1892. This was five or six years after the execution of the will, and about two years after the execution of the codicil. The *facts* to which he testified were that, while he was working for deceased, there was a difference of opinion between Mr. and Mrs. Langford as to whether some orchard land should be plowed at a certain time—whether some beans and corn should be planted at a certain place—whether a fresh milch cow should be bought for family use—whether a horse to be used about the place should be bought and another one sold; and that it turned out that these things were done in accordance with the expressed opinion and desire of Mrs. Langford. In answer to a direct leading question of respondents' counsel, "Did he appear to be afraid of her?" the witness answered: "Yes, sir." One Rowland also testified that he was a veterinarian, and that, when he was doctoring a sick horse of deceased—while Reinke was with him—the deceased told him, although he was an entire stranger, that he did not want Maria to know about it, because she might think that the horse was not sick enough to be doctored, and that he had more peace

when he let her have her way. The testimony of the
two witnesses last named about trivial domestic affairs,
if near enough to the time of the execution of the will
to be admissible at all, is entirely too paltry to have any
important bearing upon the real question at issue, par-
ticularly when contrasted with the testimony of at least
twenty witnesses, consisting of men engaged in various
kinds of business at Pasadena who were brought into
close contact with the deceased, and of various ladies
intimate in his family. The testimony of these several
witnesses covers a period which commenced a short
time before the execution of the will, and extended to
the date of the death of the deceased. It shows that his
business was large and quite varied; that, among other
things, he owned, sold, and leased many different pieces
of real property, and dealt largely with real estate agents
and purchasers of land; that he managed his business
wisely, and made shrewd bargains; that he did all his
business himself, his wife never being present; and
that, when men went to his house on business, they
saw him alone, and that, if she happened to be pres-
ent at the beginning of the interview, she left the
room. It was testified by ladies intimate in the family,
by the pastor of his church, by his family physician,
and by others having excellent opportunities of obser-
vation, that the relations between deceased and the ap-
pellant were as pleasant and cordial as those usually
existing between husband and wife, with no evidence
whatever that the deceased was either afraid or under
any unusual influence of the appellant.

There is some evidence of declarations of the decedent
about his testamentary intent, consisting mainly of the
testimony of the contestants themselves, and much of it
too remote from the time of the execution of the will to
be of any consequence, or even admissible.

The son and contestant, Charles E. Langford, said
that he received in Minnesota a letter from the de-
ceased, written at Pasadena, which was written, "as
near as I can remember, a month or six weeks before

Christmas, 1887." This letter had been destroyed, but was written in response to one sent by the witness to the deceased asking for money. He says, from memory, that the letter contained the phrase, "Please find inclosed fifty dollars to help you out of your difficulty," and also a statement of certain moneys which the deceased had expended for Charles, amounting to a little over twelve hundred dollars. The witness then proceeds: "He said he wanted me to know my exact indebtedness to him, as he calculated to make a will before long, and to deduct all that each of us children had drawn out of the property. He calculated to divide his property among his children equally, and deduct what they had drawn out of it." He also produced a letter written to him by the deceased in September, 1890. The writer says that he incloses one hundred and ten dollars, "as requested, to help you out." Some advice is then given Charles about getting into scrapes; and the only clause in the letter in point as to testamentary intent is the following: "I will depend on your honor, and, if you don't deal honorable, I will make it all right in my will."

On October 18, 1888, about a year after the execution of the will, the deceased wrote a letter to his son-in-law, Longshore, which contained the following: "Yours received and contents noted. The amount of your note due me the 1st of December next would be $265; note $200, September the 1st, '85, three years and three months' interest at ten per cent more. I think you ought to pay this now, or the first of December. It will be for your advantage, for I shall remember my children in my will according to their worth and honor in dealing with me." The balance of the letter is about other things.

John S. Herwick, son-in-law of the deceased, testified that in 1888, the year after the execution of the will, the deceased told him, in substance, that he had always told his children that his property should be theirs, and

that he intended to stick to his word, and that if they did n't get it not to blame him.

The witness Reinke, the hired man hereinbefore noticed, testified that when he worked for deceased, which was in 1892 or 1893, he said to decedent, "Well, I suppose your children are just as rich as you are," and that the deceased answered: "No, they are not. Some of them are poor, but they ain't so very poor," he says, "Probably, I don't know anything—did n't hear anything for several years of them that they are poor, but after I am dead," he says, "they can have it all."

The foregoing is about all the evidence of declarations of testamentary intent within any reasonable time of the execution of the will or codicil which we can find in the transcript—all, for instance, since the settlement of the deceased in California. Some of the contestants testified to other statements made so long before the execution of the will as to be either beyond the range of legitimate evidence, or too remote to have any appreciable value.

If we consider the above stated declarations of the deceased (supposing them to have been fully proved) in the light of the other facts of the case, it is apparent that they did not express his real intentions. He is made to speak of dividing his property equally among his children in a will to be made, when he had already made a will which he never changed (as to the contestants), in which he had given them only a certain part of his property. Three years afterward he solemnly republished that will, at the time he made the codicil. We need not inquire whether the alleged declarations were made to hasten the payments of debts owing to deceased by some of the contestants, or to appease children of a former wife who were bitterly opposed to his second marriage, or what other motive moved him to make them. The language of Justice Temple in the McDevitt will contest (95 Cal. 17) is peculiarly applicable here: "Whether by this statement the decedent intended to deceive the witness, or at the time intended to

execute a new will, is alike immaterial; for such declarations have no weight unless introduced in connection with evidence tending to prove undue influence, mental incompetency, or fraud at the time of the testamentary act "; and the case at bar is much stronger in this respect in favor of appellant than was the McDevitt case. In the case at bar the jury found affirmatively on the issue of mental capacity, while in the McDevitt case the only issue propounded to the jury was that of undue influence; and, as we have before stated, there was no evidence here of fraud. In the McDevitt case the court, speaking of such declarations, further say: "In fact, in a case like this, where the testator was beyond question of sound mind, they were entitled to no weight at all, in the absence of proof of influence as to the very testamentary act"; and further: "Under such circumstances this evidence, and all other of like character, is entitled to no weight (*Waterman* v. *Whitney*, 11 N. Y. 157; 62 Am. Dec. 71)"; and the "circumstances" in that case did not bring it within the rule stated with so much absoluteness as do the circumstances here bring the case at bar within that rule. The opinion in the McDevitt case and the citations therein made afford full authority upon this point. In that case the verdict was against the validity of the will, and the judgment and order denying a new trial were reversed; and it would be inconsistent with the decision of this court in that case to affirm the judgment in the case at bar. Numerous authorities upon the subject may be found in the notes to *In re Hess*, 31 Am. St. Rep. 665.

There was a good deal of evidence introduced over the objections of appellant which, in our opinion, was improperly admitted. The decedent was married to the appellant in the year 1873, and before that time had been divorced from a former wife, who was the mother of the contestants; and contestants were allowed to testify to declarations which, they say, the decedent made to them before, at the time of, and shortly after the marriage. For instance, some of the contestants,

when they heard of the intended marriage, endeavored to pursuade the decedent against it; they suggested that he give appellant money to buy her off; and they were allowed to testify that decedent told them (in substance) that he could not avoid it, that appellant insisted on the marriage, and even that there had been illicit relations between him and appellant. There was also testimony admitted that shortly after the marriage· he was not as jovial, and was apparently not as happy as before the marriage. There was also testimony tending to show that appellant had done some dressmaking in decedent's family before the marriage, with the view, we suppose, of showing that she made some efforts to captivate the affections of the decedent. All this was seventeen years before the execution of the will, and twenty years before the codicil in which he reaffirmed the will; it was too remote in time to be admissible for any purpose; and that it was prejudicial to appellant is beyond question. There was also some testimony as to declarations and occurrences at a somewhat later period, but before decedent's removal from Illinois to California, and, if admissible at all, they are entitled to no weight in the absence of evidence, either direct or circumstantial, that undue influence was brought to bear upon the very testamentary act. And such evidence must "do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." (*In re McDevitt, supra.*)

It is sought to distinguish the case at bar from the McDevitt case, because in the case at bar there was the relation of husband and wife; and the position ·seems to be taken that such relation raises the presumption of undue influence. But there is no such presumption. "There is no legal presumption against the validity of any provision which a husband may make in a wife's favor, for she may justly influence the making of her

husband's will for her own benefit or that of others so long as she does not act fraudulently, or extort benefits from her husband when he is not in condition to exercise his faculties as a free agent. (*Latham* v. *Udell*, 38 Mich. 238.) Accordingly, the circumstance that the testator's wife urged upon him the propriety of leaving his property to her does not constitute undue influence to vitiate the will. (*Hughes* v. *Murtha*, 32 N. J. Eq. 288.) And the mere fact that the will of the husband is changed to gratify the wishes of the wife does not raise a presumption of undue influence on her part. (*Rankin* v. *Rankin*, 61 Mo. 295.) Where a husband had made two wills dividing his property between his wife and sister, and a few days subsequent to the making of the second will, and after several days of his last illness, he made another will, revoking his former wills, without apparent reason, and leaving all his property to his wife, this, in the absence of any other evidence of undue influence, will not raise the presumption of such influence so as to require the submission of that question to a jury. (*Will of Nelson*, 39 Minn. 204.)" (Notes to *Richmond's Appeal*, 21 Am. St. Rep. 98.) In *Mason* v. *Williams*, 53 Hun, 394, it was held that "the fact that the wife of a testator had both opportunity and motive, and that the will makes provision for her beyond what the law would have given her, creates no presumption of undue influence, nor does the additional fact that the will was executed six weeks after the testator had drawn a radically different will, in accordance with a draft submitted to him by his father." The presumption of undue influence *is not raised by proof of interest and opportunity alone.* (*Turnure* v. *Turnure*, 35 N. J. Eq. 437. See other cases to same point cited in 21 Am. St. Rep. 98, et seq.) In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.

It is contended, also, that the case at bar differs from the McDevitt case, because here the will was unnatural.

The consideration of the question whether or not a will is "unnatural"—by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud, or undue influence; in which event it might serve to help out a weak case. But there is no evidence in the case at bar that could be thus helped out. A will cannot be upset because in the opinion of a jury or court it is unnatural. In the opinion of the McDevitt case it is said: "Although I do not think it of special interest here, it is well to remember that one has the right to make an unjust will, an unreasonable will, or even a cruel will. Generally, such questions turn our thoughts, as they are often intended to, from the only question at issue, which always is, only, Is the will the spontaneous act of a competent testator? Of course, juries lean against wills which to them seem unequal or unjust. But the right to dispose of one's property by will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners, and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper." (See, also, Latham v. Udell, supra.) And indeed, if it were important to consider it, we do not see how the will in the case at bar can be considered unnatural in such extreme sense as to be remarkable. At the time of the execution of the will the contestants—children of the first wife—were all grown up, middle-aged people, with families of their own. He had seen but little of them after his marriage, and in a few years afterward he had moved away from them to California. They had strenuously opposed the marriage, and had said unkind things of his wife; and, as was very natural, there was not much social intercourse between the fam-

ilies afterward.  Of course, the contestants blame the-
appellant for this; but although several of them visited.
her and were entertained at least politely, there is no
evidence that they ever invited her to visit them, except,
that on one occasion one of them said to her and the·
decedent, "Of course, you will come and see us soon."
They had appealed to him a number of times for finan-
cial aid, and he had helped them; and he was displeased
and angry because some of them followed him to Cali-
fornia.   One of the daughters, in stating the contents
of a lost letter received from decedent, said: "He began
by saying ·that he was sorry we had come here, as he
had advised us not to come, and that it looked like we
had come on purpose for him to help us; that we could
—now that we had come we could—we could hoe our
own row he would mind his—he had enough of his own
business to attend to.   I think that was about all."   Of
course, the contestants attribute this to the influence of
the appellant, and they testify to statements which they
say the decedent made to them tending to support that
view; nevertheless the fact was that they came to Cali-
fornia against his protests and thereby greatly dis-
pleased him.   He and the appellant had one child,
Mabel, who was only fourteen years old at the time of
decedent's death and quite a young child at the time of
the execution of the will.   Therefore, under all the cir-
cumstances, it is not at all surprising that his affections
bound him closely to his wife and Mabel, and that he
left them property the income of which would support
them.   By his will he gave to each of the contestants
one thousand dollars, and left the balance of his prop-
erty, which was of the value of about fifty thousand
dollars, to his wife, and, in the event of her death, to
Mabel.   The income of that amount of property would
give the wife and daughter not more than a modest
support; and, under all the circumstances, the disposi-
tion which he made of his property cannot be justly
characterized as unusual or unnatural.   At all events,

being of sound mind and memory, it was for him to dispose of his property as he chose.

(It is proper to notice particularly that the averment that appellant would not permit contestants to see the decedent is entirely unsupported by the evidence. Not only did he go about daily attending to his business entirely alone, but the appellant at one time visited the east for two months, the decedent remaining at home, and upon two occasions the decedent visited the east by himself.)

Looking through the transcript in this case we see no evidence at all sufficient to warrant a jury in annulling the solemn acts by which the decedent executed his will, and republished it in the codicil. If the law is to be changed, and the right of disposing of one's property by will, the policy of which has been sanctioned by the wisdom and experience of many generations of men, is to be taken away, that result must be effected by the legislative department of the government. As the law now stands that right cannot be frittered away after the death of the testator according to the tastes and notions of others. It is quite likely that in the case at bar the provisions of the will did not meet with the approval of the jurors; but their approval was not necessary.

The judgment and order denying a new trial are reversed.

TEMPLE, J., and HENSHAW, J., concurred.