[Civ. No. 4574.   First Appellate District, Division Two.—December 14, 1923.]

In the Matter of the Estate of THOMAS B. RICKEY, Deceased. BERTHA LEVINA SCOTT et al., Appellants, v. ALICE BELLE RICKEY et al., Respondents.

[1] WILLS—REVOCATION OF PROBATE—GROUNDS—EVIDENCE—NONSUIT—APPEAL.—In an action for revocation of an order admitting to probate a certain writing as the will of a deceased, where there are several petitions contesting the validity of said instrument, if there is evidence in the record which, standing alone or coupled with testimony erroneously excluded, or admitted and subsequently erroneously stricken out, is sufficient to sustain a possible verdict that the will should be set aside on any of the grounds alleged

in any of the petitions, a judgment granting a nonsuit must be set aside on appeal.

[2] ID.—OPPORTUNITY TO INFLUENCE TESTATOR—HOSTILITY BETWEEN CONTESTANT AND PROPONENT—EVIDENCE—PRESUMPTION.—In an action for revocation of an order admitting to probate a certain writing as the will of a deceased, proof that the second wife of the deceased (who was one of the principal beneficiaries under such will) was a person capable of influencing the deceased or that she had ample opportunity to do so does not prove that she actually did so; and the fact that her early relations with the deceased, prior to the death of his first wife, had been the cause of unhappiness in his home, and that after her marriage to the deceased, following the death of his first wife, considerable hostility existed between her and contestants (the children of the first wife), would not raise a presumption of fraud or undue influence in the making of the will.

[3] ID.—TESTATOR'S FEELINGS TOWARD CONTESTANT AND PROPONENT—UNDUE INFLUENCE—EVIDENCE.—In an action for revocation of an order admitting to probate a certain writing as the will of a deceased, conceding that certain proffered evidence showed testator's love for the contestants and his hatred and distrust of the proponents of the will, in the absence of any evidence showing undue influence directly operating upon the testamentary act at the time the will was executed, such testimony concerning the testator's feelings and the rulings of the trial court excluding or striking out such testimony becomes immaterial.

APPEAL from a judgment of the Superior Court of Alameda County. Lincoln S. Church, Judge. Affirmed.

The facts are stated in the opinion of the court.

Peter J. Crosby, John D. Murphey, J. W. Dorsey and W. E. Cashman for Appellants.

James F. Peck and M. C. Chapman for Respondents.

LANGDON, P. J.—This appeal is by certain heirs at law of Thomas B. Rickey from a judgment of nonsuit in an action in which they sought the revocation of an order admitting to probate a certain instrument as the will of Thomas B. Rickey, deceased.

2. Effect of unnatural testamentary disposition on question of undue influence, notes, 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

Thomas B. Rickey died on January 11, 1920, and an instrument in writing was admitted to probate as his will by the superior court of the county of Alameda, state of California, on January 27, 1920. By this instrument the appellants and contestants were left small legacies with the statement that the testator had made gifts to them at different times, a sister of the testator was given $100 a month for the remainder of her life, together with such additional sums as might be necessary for unusual expenses, such as illness, etc., the wife and youngest daughter of the testator, the proponents of the will, were given $5,000 each and the income from the bulk of the estate was to be enjoyed by the wife and said youngest daughter of the testator during their joint lives, said youngest daughter taking the residuum of the estate after her mother's death. By the will, the wife and youngest daughter were named as executrices to serve without bond, and they were duly appointed and thereafter qualified and were the acting executrices of the will at the time of the trial.

Within the statutory period the appellants Bertha Levina Scott, a daughter of the testator by his first wife, and Charles Treadwell Rickey and Jeannette Rickey, children of a deceased son of said testator by his first wife, severally, filed petitions contesting the validity of said instrument and praying for the revocation of its probate. The residuary beneficiaries, individually and as executrices, severally, answered each of the petitions. The contests were consolidated. A jury was called in an advisory capacity by the court, but after the evidence was presented the trial court refused to submit the case to the jury but granted the motion of the proponents of the will for an order of nonsuit against the contestants.

The petitions are lengthy, the allegations including recitals of incidents in the personal history of the testator occurring during a period of nearly thirty years. A detailed statement of these matters does not seem necessary and we shall merely state the general issues as they are concisely outlined by the appellants in their brief, to wit: Was the paper writing probated executed by Thomas B. Rickey as his will? Was the signature to said paper writing procured by fraud exercised and practiced upon said T. B. Rickey by the proponents of the will? Was the signature

to said paper writing procured by the undue influence of said proponents or either of them?

[1] It is, of course, beyond question that if there is evidence in the record, which standing alone or coupled with testimony erroneously excluded, or admitted and subsequently erroneously stricken out, sufficient to sustain a possible verdict that the will should be set aside on any of the grounds alleged in any of the petitions for revocation of probate, the judgment upon the order granting the nonsuit must be set aside.

The trial of the case extended over a period of many days, sharp legal contests occurring over the admission of evidence and much of the evidence admitted was subsequently stricken out upon motions of the proponents of the will. The reporter's transcript includes over 2,500 pages.

The appellants have printed in their brief the testimony upon which they rely and have included therein not only the testimony admitted by the trial court, but also the testimony which was stricken out upon motion. The rulings upon these motions present many intricate questions in the law of evidence, but for a decision upon this appeal a solution of these problems in unnecessary. For the purposes of this appeal only, we will concede to the appellants that every ruling on evidence of which they complain was erroneous; that all the testimony printed in their brief should have been admitted by the trial court. We consider the motion for nonsuit, then, in the light of all the testimony appearing in the appellants' brief and accept it all as true. ·

That evidence indicates reasons for antagonism between the proponents of the will and the contestants, who were descendants of testator's first wife. It also shows that the testator and Alice Belle Rickey, one of the proponents of the will, had been husband and wife for over twenty-five years prior to his death; that they had married in 1893 after the children of his first marriage were grown and after the death of their mother in 1891. A great deal of testimony was introduced tending to show that the second wife, before her marriage with the testator and during the lifetime of his first wife, had been the cause of unhappiness in his home; that after the death of his first wife, testator married said Alice Belle Rickey and considerable hostility

existed between the second wife and the children of the
first wife; that testator was a man of great wealth and
large business interests. After his second marriage he be-
came involved in business difficulties in Nevada and was
sued for a large amount of money and threatened with
criminal prosecution because of the failure of a bank of
which he had been president; that he feared his entire for-
tune would be subjected to the payment of judgments
against him and entered into a scheme with the consent
and connivance of his second wife and his son by his first
marriage by which his property and assets were so manipu-
lated as to be concealed from creditors until such time as
he succeeded in disposing of the claims against him.

Testimony was offered showing the testator's apparent
affection for his daughter Mrs. Scott, one of the contestants
and appellants here. There was also some testimony that
he had made remarks on some occasions during the last few
years of his life indicating that he was not happy in his
domestic relations and that he disliked and distrusted his
second wife; that his daughter, Mrs. Scott, was without
money for her support; that she was in poor health; that
testator had told his sister that this daughter would be pro-
vided for; that the wife and her daughter, the chief bene-
ficiaries under the will, had received valuable property from
the testator at different times prior to the execution of his
will.

It is upon substantially these facts that the appellants
rely. They argue that the wife knew of the concealment
of the husband's property to avoid the payment of possible
judgments against him and used this knowledge as a means
of coercion. There is not the slightest evidence that she so
used this knowledge, but, on the contrary, the record dis-
closes that the lawsuits which brought about the conceal-
ment of the property had been settled and the judgment
paid years before the making of the will. The record does
not even show that this matter furnished a possible means
of coercion at the time of the making of the will, much less
that such means were used by the proponents. [2] The
testimony regarding the early relations of the parties sug-
gests a reason for the alleged hostility between the respond-
ents and appellants. But that fact being established would
not raise a presumption of fraud or undue influence in the

making of the will. To prove that the wife was a person capable of influencing testator does not prove that she actually did so. "It will not be presumed because a wife has ample opportunity to exert an influence which may be undue, that she has in fact done so." (*Fulton* v. *Freeland*, 219 Mo. 494 [113 Am. St. Rep. 576, 118 S. W. 12, 19]. See, also, *Peery* v. *Peery*, 94 Tenn. 328 [29 S. W. 1], and *In re Langford*, 108 Cal. 608, 622 [41 Pac. 701].) In a Missouri case quoted with approval in *Fulton* v. *Freeland*, *supra*, it was said in relation to matters urged upon our attention by the present appellants: "The plaintiffs sought to raise a presumption of undue influence affecting the execution of the will by proofs of the relations existing between the testator and his second wife before their marriage, which was about eleven years before the making of the will; by testimony showing the dependent condition of the disinherited children; by showing that the testator had had difficulties with his first wife and had separated from her and that some of the disinherited children had taken sides with their father in those controversies; by showing that the relations between the testator and his disinherited children were friendly and affectionate about the time of the making of the will; by showing that some of the first wife's children had assisted the testator in accumulating property; and by proving some conversation of the testator, in the same year in which the will was made, concerning his intended disposition of his property. There was also an offer to prove that one of the testator's daughters by his first wife had been obliged to leave her father's house, by reason of his second wife's request or influence to that effect. All the offers of testimony upon these matters were, upon defendant's objections, refused by the court, and these refusals are assigned for error. We can discover no ground for admissibility of any of this proposed testimony. The plaintiffs have undertaken to prove that the paper purporting to be the last will and testament of their ancestor was the product of an undue influence exercised upon him by Sarah M. Ketchum. 'Undue influence is that which compels a testator to do that which is against his will, through fear, through the desire of peace, or some coercive power which he is unable to resist, and but for the exercise of which the will would not have been made as it was.' (*Pierce* v. *Pierce*, 3

Cent. L. J. 226.)   The testator was married to his second
wife in 1855.  His will was executed in 1866, and he died
in 1877.  Here is a period of more than twenty years, at
some time during which these incidents of remote bearing
or none at all, are supposed to have indicated that the
testator, in the hour when his will was written and signed,
was acting under the coercive power above described, and
that this coercive power was in fact held over him by Sarah
M. Ketchum.  Cause and effect are here far too widely sepa-
rated for the purpose of fair investigation.  All or any of
the facts tendered might or might not coexist with a total
absence of any such undue influence.  They prove, or tend
to prove, upon the question at issue, absolutely nothing.
Their only effect, if introduced in evidence, might be, in
the hands of ingenious counsel, to play upon the passions
or prejudices of a jury, and give them an apparent excuse
for thwarting the unkind discrimination of a father against
some of his children.''

The facts appearing in the record show that the propo-
nents of the will had nothing whatsoever to do with its execu-
tion and knew nothing of its terms.  The following facts
with relation to the testamentary disposition of testator's
property appear uncontradicted in the record: The will
was signed on August 14, 1918, about a year and a half
before Mr. Rickey's death.  At that time Mr. Rickey was
in a sanitarium recovering from an illness.  He was nearly
eighty years old and his eyesight had been poor for some
time.  It was impossible for him to read, but he was able
to distinguish persons and to go about unaided.  He ap-
pears to have been a man of great mental vigor at all times
and the evidence shows that this condition had not changed
at the time the will was made nor for considerable time
after that.  About August 10 or 11, 1920, testator asked his
wife to telephone to his attorney and ask the attorney to
call at the hospital.  She stated she did not know why
Mr. Rickey desired to see his attorney, but she complied
with his request.  The attorney was not alive at the time of
the trial, but his deposition was introduced in evidence and,
in all essential particulars, it corroborates the proponents
of the will in their account of the circumstances surrounding
its execution.  It appears, uncontradicted in the record, that
the attorney went to the hospital in response to this tele-

phone message and was told by Mr. Rickey that he wished to make a will. Mr. Rickey explained what provisions he desired and gave the attorney the names of his children and grandchildren. The conversation occurring at that time, as narrated by the attorney, showed a complete intellectual grasp of his personal affairs by the testator. The attorney made notes of what was desired and returned to his office and had a draft of a will made. He returned the next day with the typewritten will. Rickey asked the attorney to read the will to him, which was done. He then asked that it be read again. After the second reading, testator said, "Now that is all right, just the way I want it, but I forgot something. I want to make a provision for my sister, Anna Plate." The attorney took the draft of the will to his office and had it typewritten, incorporating therein a provision for the benefit of the sister of testator in accordance with directions from said testator. Upon the next day the attorney took the amended draft of the will to 'the sanitarium and at the request of Mr. Rickey read it aloud to him. Mr. Rickey asked questions about the legal effect of certain provisions and then asked that the entire will be read to him again, which was done. Mr. Rickey then said that the will was what he wanted and that he was ready to execute it. The proponents of the will were not in the room with the testator during the times when any of these conversations occurred between him and his attorney. The attorney went into the office of the sanitarium and secured two nurses to witness the will. Mr. Rickey duly executed the will and handed it to his attorney, telling him to keep it and not disclose its contents to anyone. The attorney kept the will in his safe deposit box until after the death of the testator, when he handed it to Mrs. Rickey. The attorney testified that he had known Mr. Rickey for years before his death; that at the time of the execution of the will "his mental condition was as clear and vigorous and keen as it ever was. . . . Physically he was getting over a spell of sickness. He was feeling well; he was cheerful, smiling, laughing and joking with the nurse and sitting up in bed. He was all right and within a few days afterwards he left the sanitarium and went home, and was discharged." There is evidence that over a year later the contestant Mrs. Scott and a nurse employed

to care for Mr. Rickey read to him daily books and magazines and newspapers and that he took a keen interest in them and his mind was clear and active, and there is abundant evidence in the entire record that during his entire lifetime Mr. Rickey was a man of more than ordinary mental acuteness.

In relation to the making of the will, proponents testified in substantial accord with the attorney and from their testimony it appears that they had no knowledge that a will was to be made and knew of none of its provisions until after Mr. Rickey's death; that after the execution of the will and the departure of the attorney, they learned from the testator that a will had been executed by him and left with his attorney, but did not learn the contents thereof.

The motion for a nonsuit was made upon the ground that there was no evidence produced of any influence, undue or otherwise, upon the testamentary act. The appellants do not point out to us any such evidence. In this case, as in the case of *Estate of Donovan,* 140 Cal. 390 [73 Pac. 1081], "the testator was of sound mind and in the active management of his own affairs . . . no evidence was offered to show that it was executed at a time other than upon the date it bore; that no claim was made that the appellant (respondent here) was present when the will was made, or that she ever at any time requested the decedent to make a will, or that she ever made a suggestion in reference to the making of a will, or that she ever knew of the existence of the will (in the present case, the contents of the will) until after her husband's death."

As stated in the *Estate of Donovan, supra:* "General influence not brought to bear upon the testamentary act, however controlling, is not undue influence such as will afford ground for the setting aside of the will of a person of sound mind. (*Estate of McDevitt,* 95 Cal. 17 [30 Pac. 101]; *Estate of Langford,* 108 Cal. 609 [41 Pac. 701]; *Estate of Calkins,* 112 Cal. 296 [44 Pac. 577]; *In re Wilson,* 117 Cal. 262 [48 Pac. 983].) Undue influence, however used, must, in order to avoid a will, destroy the free agency of the testator at the time and in the very act of the making of the testament. It must bear directly upon the testamentary act. (*Goodwin* v. *Goodwin,* 59 Cal. 560; *Englert* v. *Englert,* 198 Pa. St. 327 [82 Am. St. Rep. 808, 47 Atl.

940]; Page on Wills, ed. 1901, secs. 127, 130; Chaplin on Wills, p. 95.) Says Chaplin: 'The true test of undue influence is that it overcomes the will without convincing the judgment.' It is apparent, therefore, that there is in this case an entire absence of evidence legally sufficient to show that the appellant here unduly influenced the mind of this testator in his testamentary act, and the conclusion seems irresistible that under the stimulus of their sympathy the jury substituted their views of a fair will for that which under the law the testator had the undoubted right to make. For, as has been said, 'A testator of full age, sound and disposing mind and memory, and not under restraint, may make such disposition of his property as does not conflict with the law.' The fact, then, that a testator with such qualifications makes a foolish, unnatural or unjust will, does not show that undue influence caused the will.''

In *In re McDevitt*, 95 Cal. 17, 33 [30 Pac. 101], it was aptly said: ''The beneficiaries of a will are as much entitled to protection as any other property owners, and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just or proper. . . . Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here. There is no proof. Circumstances have been proven which accord with the theory of undue influence, none of which is inconsistent with the hypothesis that the will was the free act of an intelligent mind. This does not amount to proof. And many circumstances are shown which are wholly inconsistent with the hypothesis of undue influence. And the presumption of law, in the absence of all proof, in a contest, is in favor of the will.''

*In re Langford*, 108 Cal. 608 [41 Pac. 701], recites facts which liken it to the instant case. In that case, a second wife was the chief beneficiary of the testator to the disad-

vantage of children of his first marriage who contested the will. Evidence was introduced to show that the second wife of testator had worked in the home of his first wife during the first marriage and that the relations between her and the testator had been illicit. The court said: "All this was seventeen years before the execution of the will, and twenty years before the codicil in which he reaffirmed the will; it was too remote in time to be admissible for any purpose; and that it was prejudicial to appellant is beyond question. There was also some testimony as to declarations and occurrences at a somewhat later period, but, before decedent's removal from Illinois to California, and, if admissible at all, they are entitled to no weight in the absence of evidence, either direct or circumstantial, that undue influence was brought to bear upon the very testamentary act. And such evidence must 'do more than raise a suspicion. It must amount to proof.' . . . In order to set aside a will for undue influence there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made."

With regard to the claim of appellants that the will we are considering in the instant case is an unnatural one and suggests by its contents undue influence, it is pertinent to quote further from *In re Langford, supra:* "The consideration of the question whether or not a will is 'unnatural'— by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud or undue influence; in which event it might serve to help out a weak case. But there is no evidence in the case at bar that could be helped out. . . . And indeed, if it were important to consider it, we do not see how the will in the case at bar can be considered unnatural in such extreme sense as to be remarkable. At the time of the execution of the will the contestants—children of the first wife—were all grown up, middle-aged people with families of their own. He had seen but little of them after his marriage. . . . They had strenuously opposed the marriage and had said unkind things of his wife; and, as was very natural, there was not much social intercourse between the families afterwards. . . . At

all events, being of sound mind and memory, it was for him to dispose of his property as he chose."

The case of *In re Calkins*, 112 Cal. 296 [44 Pac. 577], is pertinent because of the testimony relied upon by appellants in the instant case to show that the testator did not have any affection for his wife at the time he made the will and that he distrusted her. In the Calkins case it was said: "The claim of the contestant that the testatrix had no affection for her husband would rebut any presumption of undue influence on his part, as would also the claim that the testatrix had a hearty dislike for Mrs. J. W. Calkins."

[3] An examination of the authorities in this and other jurisdictions convinces us that the position of the respondents is correct when they state that if it be admitted that the testimony shows Mr. Rickey's love for the contestants and his hatred and distrust of the proponents of the will and that the trial court erred in every ruling in excluding and striking out such testimony, nevertheless, in the absence of any evidence showing undue influence directly operating upon the testamentary act at the time the will was executed, such testimony concerning the testator's feelings and all such rulings concerning such testimony would become immaterial. (*Estate of McDevitt, supra; Estate of Arnold,* 147 Cal. 583 [82 Pac. 252] ; *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407] ; *Estate of Ricks,* 160 Cal. 467, 485 [117 Pac. 539].)

The judgment is affirmed.

Nourse, J., and Sturtevant, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 11, 1924.