[Civ. No. 13065. First Dist., Div. Two. Apr. 25, 1946.]

Estate of KATHERINE A. McGIVERN, Deceased. BLOSSOM MARTIN, Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, as Executor, etc., et al., Respondents.

Walter H. Hewicker for Appellant.

Thos. J. Riordan, Eugene H. O'Donnell, Charles A. Sweigert, Albert T. Roche and Charles F. Craig for Respondents.

NOURSE, P. J.—The contestant of a will appeals from the judgment entered on a jury verdict against her on the count of unsound mind and from the order granting a nonsuit on her count of undue influence.

Katherine McGivern (a single woman) was a retired school teacher at the time of her death on November 27, 1943. She died as the result of injuries incurred when she was struck by an automobile October 23, 1943. Her last will and testament executed on June 15, 1935, was admitted to probate on December 27, 1943. It provided that the Bank of America act as executor; that it act as trustee of her property and pay her half-sister, Elinor Quivey, $50 a month for life; after her death the trustee was to pay legacies to her housekeeper and her two named cousins and give the residue to Father Thomas Byrne (administrator of her parish) to "be disposed of by him in accordance with my wishes heretofore expressed to him, although . . . it is not my intention to create any trust. . . ." The will further provided that if Elinor Quivey predeceased the testatrix the same legacies should be paid and the residue should go to Father Thomas Byrne "to be disposed of by him in accordance with my wishes. . . ." The will made no mention of Blossom Martin (contestant) who was a grandniece by half blood of the testatrix or of Frank Quivey, Elinor Quivey's brother. The will was admitted to probate and Blossom Martin contested on the grounds of unsound mind and undue influence charged to Father Byrne. Frank Quivey assigned his interest to Mrs. Martin. At the trial the following facts were shown:

Testatrix had been a school teacher in San Francisco from 1898 to her retirement in July, 1936. She had been principal of various schools and in 1928 was appointed principal of the Alma school. She remained at this position until her retire-

ment in July, 1936. In 1933 she received an "above average" efficiency report. She took an active part in the school savings program and in parent teacher activities until her retirement. Several months prior to June 15, 1935, she notified the Bank of America she wished to make a will as she was planning a trip to Europe. She went to attorney A. T. Roche, gave him instructions and he drafted the will. She called at his office and he read the will to her. They went to the Bank of America and the will was executed with Roche and Mr. Farber as witnesses. That evening testatrix left on an eleven weeks' vacation in Europe. She wrote letters to her friends describing the voyage. After her return she continued her work as principal of the Alma school until July, 1936, when she retired.

Both Roche and Farber testified that the testatrix was fully competent at the time of the execution of the will. The companions of testatrix on her European trip affirmed her sanity and rationality. Father Byrne testified that he had not talked with testatrix about her affairs any more than with his other parishioners. Testatrix had not expressed any wish to him as to what should be done with her property, although just before she left on her trip she told him she was naming him as executor. He told her she could not do that as priests were not allowed to mix in family affairs in any way. He testified that he did not know attorney Roche until after the death of Miss McGivern when Roche wrote and told him about the will.

Contestant testified that she and testatrix were in San Jose during Mrs. Quivey's last illness. As she walked into the room she heard testatrix, "saying to my mother that she was going to change lawyers because Father Byrne was dissatisfied with the lawyer that she had then, and that he was going to take her to his lawyer and that she was going to make a will, and she asked my mother for some papers." Mr. O'Conner testified that in 1937 testatrix opened an account with the Bank of America and made various purchases of stock. He found her competent and with a keen mind.

On June 9, 1936, testatrix qualified as administratrix of her brother's estate and handled its affairs. When she was hit by an automobile in October, 1943, she was sent to St. Mary's Hospital and remained there until her death. In November her cousin, Sarah Larkin, filed a petition to be appointed guardian because of the need to pay the nurses and hospital expenses. When the petition was shown to testatrix "She was very antagonistic to the word 'incompetent' . . . and that is

why we never went through with it." She died before the petition was heard.

■ Appellant's first assignment of error is: "The Court Committed Error in Instructing the Jury That a Will Cannot be Upset Even Though in the Opinion of the Jury It Is Unnatural." Several instructions on "unnaturalness" were given (at whose request it does not appear) and those instructions state the law correctly. Thus we find the following:

"If you find from the evidence in this case that Katherine A. McGivern had testamentary capacity at the time of the execution of her will, you cannot invalidate her will, even though you believe that the provisions thereof are unnatural, unreasonable or unjust, irrespective of her reasons or motives for making such disposition of her property."

Again, "A person of sound mind may select such objects of her bounty as she prefers. The fact that you disagree with her choice, and think her selection unfair, cannot invalidate her will. You are not authorized to overturn a will merely because its dispositions do not conform to your notions of justice or propriety."

The portion of the instruction upon which appellant relies must be read with the entire instruction which is: "A will cannot be upset because in the opinion of a jury it is unnatural. The jury are instructed that as a matter of law one has a right to make an unjust will, an unnatural will, an unreasonable will, or even a cruel will. The real question at issue always is, is the will the spontaneous act of a competent testatrix. If it is, it should be sustained. The right to dispose of one's property by will is most solemnly assured by law and is a most valuable incident to ownership and does not depend upon its judicious use."

The instructions on the issue were sound and they are supported by ample authority. In *Estate of Higgins,* 156 Cal. 257, 265 [104 P. 6], the Supreme Court said: "And where the will makes an irrational or unnatural disposition of property, this is a circumstance to be considered in determining the state of mind of the testator. But, *if there be no defect of testamentary capacity,* a will is not to be upset because its provisions may seem to the court or the jury to be unreasonable, unnatural, foolish, or unjust. (*In re Wilson,* 117 Cal. 262, 277 [49 P. 172, 711]; *In re McDevitt,* 95 Cal. 33 [30 P. 101]." (Emphasis added.) ■ A concise statement of the rule involved in these instructions is that if the maker of a will is of sound mind,

and was not acting under undue influence, his will cannot be invalidated *solely* on the ground that the court or jury believes it to be unnatural, but that "unnaturalness" is an element, or circumstance, which may be considered in determining whether the maker was competent, or whether the will as executed was his free and voluntary act.

These instructions were followed by a correct enumeration of the relationships which the law recognizes as natural objects of a person's bounty. Since the contestant herein was a grandniece of the testatrix she was not within the group of natural objects of the bounty of deceased and her effort to prove the incompetency of deceased on the ground that the will was "unnatural" was abortive.

On the issue of contestant's claim to be a "natural object" of decedent's bounty this court, in answer to the same argument as that raised here, in *Estate of Nolan,* 25 Cal.App.2d 738, 742 [78 P.2d 456], said: "The expression 'natural objects' of the testator's bounty has reference to the descendants, surviving spouse, and parents of the testator, who, purely by reason of relationship, may be assumed to have had claims upon his bounty. (26 Cal.Jur. p. 695.) Nephews, nieces, brothers, sisters, and other collateral heirs, are not, because of such relationship alone, natural or normal objects of bounty. (*Estate of Easton,* 140 Cal.App. 367, 377 [35 P. 2d 614] ; *Estate of Jacobs,* 24 Cal.App.2d 649 [76 P.2d 128].) In *Estate of Finkler,* 3 Cal.2d 584, 597 [46 P.2d 149], it was held that nephews and nieces of a predeceased spouse, though heirs at law, were not the natural objects of the bounty of the testator."

It is a settled rule of our appellate procedure that the appellant must show at whose request criticized instructions were given. Otherwise an appellate court must assume that they were given at his request. (*Leenders* v. *California Hawaiian etc. Corp.,* 59 Cal.App.2d 752, 759 [139 P.2d 987] ; 2 Cal.Jur. 870.) For this reason appellant is in no position to attack any of the instructions given, but, since they are a correct statement of the law we prefer to rest our holding on that ground rather than the technical one of procedure.

Appellant argues that it was error to grant the motion for nonsuit on the second count charging undue influence. As evidence of undue influence on the part of Father Byrne appellant states that he was merely a casual acquaintance known to her "only as the ordinary parishioner knows

her priest." But there is no evidence that Father Byrne, or any one in his behalf, exercised any pressure upon the mind of the testatrix, that he knew that the will was being executed, that he at any time discussed the subject of the will with the testatrix, or that he used any influence at any time to procure the execution of the will, or the legacy to him. Viewing the entire evidence in the light most favorable to the appellant the sum and substance of it is that Father Byrne received a legacy of a very substantial portion of the estate, presumably for the benefit of the Roman Catholic Church, of which the deceased was a devoted member, but that he knew nothing about the will or the legacy until after deceased's death, and that he took no part in its execution.

It is the settled rule that: "Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on the testamentary act. (*Estate of Langford,* 108 Cal. 608, [41 P. 701]; *Estate of Carithers,* 156 Cal. 422, [105 P. 127].)" *Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762].

In *Estate of Morcel,* 162 Cal. 188, 195 [121 P. 733], the Supreme Court, in speaking of the quantum of proof necessary, said: "And it must also be borne in mind that a mere suspicion that undue influence *may* have been used is not sufficient to warrant the setting aside of a will on that ground. (*Estate of Keegan,* 139 Cal. 127 [72 P. 828].) The evidence against the will must 'do more than raise a suspicion. It must amount to proof and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.' (*In re McDevitt,* 95 Cal. 33 [30 P. 106].) 'In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.' (*In re Langford,* 108 Cal. 623 [41 P. 705].)"

The record here discloses that if the opportunity to influence the testatrix existed it was not employed and appellant's argument rests upon the shallow theory that because someone has been made a substantial bequest he must have used undue influence upon the testatrix.

The right of a testator to leave his property to any one he sees fit, or to a charitable or religious institution can-

not be denied. Nor is the consent of his relatives to such disposition necessary to rebut any inference of undue influence arising from the will itself. ■ But here there are no facts which would remotely support an inference of undue influence. Granting to the appellant the benefit of the most favorable view of the evidence on the issue of undue influence, the conclusion necessarily follows that there was no evidence upon which any inference could rest—nothing but suspicion which might excuse some of the jurors in voting to reject the will because of their antipathy or prejudice against the church which was the beneficiary of the gift.

■ Finally appellant argues that she was denied a fair trial because of the bias and prejudice of the trial judge. The error is asserted for the first time on the appeal and we cannot understand why counsel for appellant has raised it. More than seventy instances of misconduct or prejudice are cited in the brief and in not one of these instances did counsel raise the point in the trial court. It is a well known and well settled rule of procedure that in the absence of a specific objection or exception made in the trial court where the error might have been cured by an explanation or instruction the reviewing court will not consider assignments of misconduct. (*People* v. *Osborn*, 12 Cal.App. 148, 150 [106 P. 891] ; 2 Cal. Jur. pp. 234, 281 ; 4 C.J.S. p. 558.)

However, in fairness to the trial judge we should add that we have examined the numerous assignments and find nothing to justify the charges of misconduct. At the most the trial judge displayed some impatience because of the tedious conduct of counsel for appellant in their repetitious examination of witnesses on wholly irrelevant and inconsequential matters. We find nothing in his conduct of the trial which indicates any bias or prejudice against the appellant.

Judgment affirmed.

Goodell, J., and Dooling, J., concurred.